**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Sherwin K. Parikh MD, P.C. d/b/a Tribeca Skin Center, on behalf of itself and all others similarly situated, | DOCKET NO. 24-cv-4848 |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **DEMAND FOR JURY** |
| Accessibe, Inc.; John Does 1-5, | |
| Defendant | |

Plaintiff Sherwin K. Parikh MD, P.C., d/b/a Tribeca Skin Center (hereinafter "Tribeca Skin Center" or "Plaintiff") individually and on behalf of all other similarly situated ("Class Members"), brings this Complaint against Defendant Accessibe, Inc.[1] ("Accessibe") and alleges the following based on personal knowledge as to its own actions, based on its counsel's investigations, and upon information and belief as to all other matters as follows:

## I.     INTRODUCTION

1.     Plaintiff brings this action seeking damages caused by Accessibe's misleading and false representations in its advertising, its direct marketing, its standard form correspondences with customers, and in its standard form contract regarding its "overlay" products that purport to adjust any website's underlying code to ensure that the website meets all legal and regulatory standards needed to comply with Title III of the Americans with Disabilities Act ("ADA"). Plaintiff further seeks injunctive relief that would require Accessibe to discontinue its deceptive practices.

2.     The ADA, codified as 42 U.S.C 12101 *et seq.*, seeks to prevent discrimination based on disability by requiring businesses to make their public accommodations accessible to

---

[1] Accessibe operates under the stylized name accessiBe. This action refers to the company by the more common capitalization style and reference to Accessibe should be taken to include accessiBe.

people with disabilities. In 2010 the Department of Justice asserted that internet websites constitute public accommodations and that ADA requirements to provide access to people with disabilities apply to internet websites.

3. Neither the ADA nor its accompanying regulations set out specific criteria itemizing what makes an internet website accessible or what accommodations a website must incorporate. The World Wide Web Consortium ("W3C") is an international organization that has published and periodically updated the Web Content Accessibility Guidelines ("WCAG") as guidelines for website designers to improve internet accessibility to people with a range of disabilities.

4. The ADA does not explicitly incorporate the WCAG. Nevertheless, the WCAG standards and recommendations are commonly viewed as the industry standard for internet website compliance with the ADA. The WCAG is incorporated by reference in Section 508 of the Rehabilitation Act that governs Federal departments and agencies' use of electronic and information technology. The WCAG is used as the technical standard for multiple international accessibility laws, including the European Accessibility Act ("EAA") in a policy document known as EAA / EN 301 549.

5. Recent years have seen a dramatic increase in lawsuits alleging that a business's website does not comply with ADA Title III. Most of these cases are filed by a small number of law firms that file hundreds of nearly identical boilerplate complaints with nearly identical factual allegations.[2] While such claims are rarely, if ever, tried to verdict, the legal actions are nonetheless

---

[2] See, *Martin v. Second Story Promotions, Inc*., No. 1:22-CV-10438 (MKV), 2024 WL 775140, at *3 (S.D.N.Y. Feb. 26, 2024) (noting that the same plaintiff represented by the same counsel, initiated ten separate ADA website actions with "carbon-copy complaints" in the Southern District of New York on the same day using largely "identical language to state the same conclusory allegations.")

disruptive and expensive for the businesses that are sued.

6.      The process of remediating a website to ensure ADA compliance requires significant time and effort and can cost tens of thousands of dollars. In 2018, Defendant Accessibe, began marketing "overlay" products that it claimed obviate the need for the labor-intensive process of manually remediating a website to comply with WCAG standards. Accessibe claims that its product, that it calls a "widget" and markets as an "accessWidget," can be installed in a matter of minutes and then employs artificial intelligence and automation to repair a website's underlying code to render a website consistent with WCAG standards such that it ensures ADA compliance within 48 hours. Accessibe further claims that its product, using artificial intelligence, will continue to automatically ensure ADA compliance and will thereby shield a subscriber from lawsuits alleging ADA violations.

7.      Accessibe's claims about the efficacy of its products are overstated and many of its specific representations are materially misleading and false—as is its guarantee that its products will ensure that a website is ADA compliant. Accessibe's fundamental claim is that installing its widget will, in and of itself, ensure that a website will meet WCAG recommendations and ADA compliance. This is simply untrue. While its widget adds a line of code to a website and installs certain web accessibility tools, this is a far cry from meeting all or even most WCAG standards. Most accessibility issues remain unaddressed. In many cases, installing Accessibe's widget actually hinders accessibility, in that Accessibe's widget interferes with necessary accessibility technology tools widely used by users with disabilities who require such accessibility tools to browse the Internet.[3]

_____

[3] See, e.g. Overlay Fact Sheet, described infra ¶32, section describing responses by users with disabilities to using overlay products including Accessibe products. Available at https://overlayfactsheet.com/en/#in-their-own-words accessed June 18, 2024.

8.     Accessibe advertises that its products will lower the likelihood that customers will be sued for violations of the ADA. Accessibe's claims in this regard are false. In fact, businesses that use Accessibe's products are more likely to be the targets of lawsuits. Use of Accessibe's widget serves as a signal that a business has used a flawed shortcut to make its website accessible to people with disabilities—one that actually impedes visually impaired people from using the website.

9.     As more fully described below, Accessibe makes specific and material claims to induce businesses to purchase its widget as an effective alternative to the work required to actually be ADA compliant. Among these inducements is the promise to provide legal support if the business ever faces legal claims that its website does not comply with the ADA. In truth, Accessibe provides no substantive legal support. A business that faces a lawsuit must then spend thousands of dollars on legal fees to defend against the very lawsuit from which Accessibe promised to shield it.

10.     Plaintiff and each of the members of the proposed Class purchased subscriptions to Accessibe's products and/or installed its overlay widget on one or more of their websites. Plaintiff and the proposed Class members did not get the product or service Accessibe claimed to provide and were left exposed to legal claims that, in the case of Plaintiff and at least hundreds of others, cost them thousands of dollars. Plaintiff seeks to represent itself and similarly situated individuals and entities throughout the United States who purchased subscriptions for Accessibe's acccessWidget and/or its "accessFlow" platform for testing, monitoring, and remediating websites. Plaintiff seeks restitution of the monies it and the putative Class spent on Defendant's service, consequential damages, injunctive relief enjoining Defendant's ongoing unlawful, unfair, and deceptive business practices, and other damages on behalf of itself and the putative Class.

## II.    PARTIES

11.    Plaintiff is a professional corporation that operates a dermatology clinic under the name Tribeca Skin Center. Plaintiff is located in Manhattan and has, at all relevant times, resided in New York County which is located in the Southern District of New York.

12.    Defendant Accessibe is a company registered in Delaware. Accessibe conducts business in this judicial district and sells its products and subscription services throughout the United States. On information and belief, Accessibe maintains computer servers located in the State of New York, leases office space in New York, and has designated courts located in the city of New York as the exclusive forum for litigating any disputes regarding its products or services.

13.    Defendants John Does 1-5 refer to parents, subsidiaries, and affiliated persons or entities of Accessibe, Inc.

## III.    JURISDICTION AND VENUE

14.    This Court has subject matter jurisdiction over Plaintiff's claims under 28 U.S.C. § 1332(d)(2), because (a) there are 100 or more Class members, (b) at least one Class member is a citizen of a state that is diverse from Defendant's citizenship, and (c) the matter in controversy exceeds $5,000,000, exclusive of interest and costs.

15.    This Court has personal jurisdiction over Defendant Accessibe because it maintains office space in this District and transacted business in this district for purposes of this lawsuit.

16.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because Plaintiff is located in this District and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District. Venue is also proper in this District as Defendant's standard form agreement with Plaintiff and with each of its subscribers provides that any legal

proceeding be brought in the courts located in New York, New York and governed by the laws of the State of New York.

## IV.    FACTUAL ALLEGATIONS

### *Background*

17.    Millions of Americans live with disabilities, such as vision, motor, cognitive, or hearing impairments, that affect their ability to access information and content through the internet. Many, if not most websites are not fully accessible to individuals with disabilities.

18.    For example, many visually impaired people cannot view the text and images on a webpage but still want and need to use the Internet. To browse the Internet, these users rely on screen reader technology that presents an audible description of the text and images and enables the user to navigate through the website. Screen readers function by examining the code the computer browser uses to render text and images on a webpage. This code is often in the form of hypertext markup language (HTML) or document object model (DOM). The screen reader reads the code and interprets it. This includes reading and announcing a description of the images that appear on a webpage.

19.    Several website shortcomings and issues can render a webpage less accessible to individuals with disabilities. In an effort to address these issues, domestic and international organizations have promulgated rules and guidelines for website designers to implement to improve accessibility. Chief among these is the WCAG, that sets out specific guidelines to make websites accessible to people with various disabilities including blindness and low vision, deafness and hearing loss, limited movement, speech disabilities, photosensitivity, and learning disabilities. W3C published the most recent version, WCAG 2.2 in October 2023.[4] The previous version,

---

[4] WCAG 2.2 is available at https://www.w3.org/TR/WCAG22/#conformance-to-wcag-2-2

WCAG 2.1, was issued in 2018.

20.     WCAG 2.1 presents 13 broadly worded guidelines for creating accessible content. Those guidelines are further broken down into 73 "Success Criteria" that are written as testable statements that a particular website may either satisfy or not satisfy. The normative portion of the WCAG standard spans 105 pages, when printed.

21.     Conformance with the WCAG is broken into three levels: level A, level AA, and level AAA. A website's "conformance" to a standard is defined as an entire website meeting or satisfying the itemized Success Criteria for each standard.  That is, there is no content on any portion of the website that violates the Success Criteria. And for a website to be considered conforming to WCAG level AA, the website must meet all Level AA Success Criteria on each page of the site.[5]

22.     Experts in the accessibility field recommend first auditing a website for errors both with automated tools as well as with manual testing, followed by remediating the underlying code. Finally, they recommend additional manual testing that reviews a website's accessibility to people with different kinds of disabilities. A full audit and remediation can take weeks or even several months and the cost is a minimum of several thousand dollars, depending on the number of unique pages on the website.

**Accessibe falsely claims to automatically make websites conform to WCAG standards**

23.     In 2018, Accessibe began selling a software product in the United States on a subscription basis. Accessibe currently offers annual subscriptions for $490 for its "Standard" package for websites under 1,000 pages, $1,490 for its "Advanced" package that for websites

---

[5] See https://www.w3.org/TR/WCAG21/#conformance

under 10,000 pages, or for additional add on features, and $3,490 for its "Advanced Plus" package for websites under 100,000 pages, or for an additional set of add on features. Accessibe offers monthly subscriptions where the current monthly rates are $49, $149, and $349 for the respective tier packages.

24.     Accessibe claims its product is an effective, quick, and cost-effective alternative to manually remediating a website to meet WCAG standards and to guarantee full compliance with the ADA. Indeed, Accessibe guarantees that installing its widget on a website will make that site fully ADA compliant within 48 hours.

25.     Accessibe offers potential customers a free "scan" of their websites. This automated scan generates a report that invariably shows and itemizes multiple failures in accessibility and a lack of WCAG compliance.

26.     Accessibe claims that by adding a single line of code to a website, installing its accessWidget will automatically cure accessibility problems, and that its artificial intelligence will continue to scour the website and repair accessibility issues such that the website will be fully compliant within 48 hours according to WCAG 2.1 success criteria at the ADA level.

27.     According to Accessibe, its Terms of Service constitutes a binding contract with each user that govern each subscriber's access and use of Accessibe services. The Terms of Service describes the services to which customers subscribe as follows:

> The purpose of the Services is to provide you with information and/or software solutions that will assist you in promoting the accessibility of website(s) (a website, or portion thereof, on which accessWidget has been correctly installed or which has been remediated using accessServices, shall be referred to as a "Customer Website(s)" or "Your Website") in accordance with the Web Content Accessibility Guidelines version 2.1 ("WCAG") at the AA level success criteria and with the Americans with Disabilities Act ("ADA" and together with the WCAG, "Standard").

The Terms of Service further state that:

Installation of accessWidget enables automatic addressing **and resolution** of website accessibility issues.
(emphasis added)

28.    Accessibe's public website has at various times included representations claiming that use of its product will render a website fully compliant with WCAG standards within 48 hours following a two-minute installation process for a fraction of the cost of undertaking a manual website remediation. Such representations have included, but are not limited to the following:

a)    "By using AI and automation, we can make thousands of websites accessible in the amount of time it used to make just one - and at a fraction of the cost."[6]

b)    On its homepage as it existed on October 20, 2021, Accessibe held itself out as an "automated web accessibility solution for ADA & WCAG compliance," with "2 minute installation for 24/7 automatic accessibility."

c)    As its website as it existed on October 16, 2022, Accessibe's claimed its product will make any website accessible and compliant with WCAG 2.1, ADA Title III, Section 508, and EAA/EN 301549 with a single line of JavaScript code "in up to 48 hours" in the following graphic:



d)    In a video entitled WCAG 2.1 Compliance Overview Accessibe describes the three levels of WCAG compliance, wherein levels A and AA are required by legislation

---

[6] (https://AccessibeAccessibe.com/company) captured October 21, 2021.

and states "if you're looking to make your site WCAG compliant, Accessibe is the most affordable and effortless way to achieve that."[7]

   e) Nearly every page of Accessibe's website includes a graphic at the bottom of the page with a check mark beside the following text

- WCAG 2.1 COMPLIANCE
- ADA Title III COMPLIANCE
- Section 508 COMPLIANCE
- EAA/EN 301549 COMPLIANCE
- ACA/AODA COMPLIANCE

29. Accessibe sent direct marketing emails to wide audiences similarly representing that its accessibility interface solves 30% of the ADA and WCAG 2.1 requirements instantly and that the remaining 70% are solved within 48 hours on an automated basis using artificial intelligence.

30. In a September 19, 2019 Facebook post that remains publicly viewable, Accessibe represented that using its product obviated the need for **all** manual remediation work to make a website compliant, stating: [8]

---

[7] https://AccessibeAccessibe.com/compliance accessed June 2, 2024.

[8] https://www.facebook.com/AccessibeAccessibe/photos/a.1070584513128523/1314238058763166 accessed June 3, 2024.



31.     The above claims are false. Leading experts in the field of internet accessibility overwhelmingly recognize that conforming any website to WCAG standards requires manual remediation that includes manual testing, which must continue as websites change over time. There are currently no shortcuts that are effective to meet WCAG standards and achieve ADA compliance.

32.     In 2021 a group of professionals in the Internet accessibility community issued an "Overlay Fact Sheet" that evaluated what automated overlays, including Defendant's products, can and cannot do. This document has been endorsed by more than 850 signatories that include accessibility experts, disability rights advocates, editors of the WCAG, and end users with disabilities. Among other things, the fact sheet concludes that no existing overlay product on the market can cause a website to become fully compliant with any existing accessibility standard.

Moreover, the Fact Sheet notes that using an automated overlay often runs counter to and interferes with accessibility tools on which people with disabilities commonly rely and has a tendency to hinder many disabled persons' ability to navigate internet websites.[9] The Fact Sheet concludes that overlay products like Accessibe's do not help visually impaired people access the web, but instead actually hinder their access.

33.     At present, practitioners in the field of website accessibility recognize that even the best automated software can only detect 30% of WCAG guidelines and the remaining 70% cannot be assessed — let alone remediated — with artificial intelligence but requires human manual testing.[10]

34.     For the following reasons, among others, Accessibe's product cannot provide full ADA compliance for all users:

a)     Many websites are dynamic and WCAG success criteria relate to things that change on a web page during user-triggered action that cannot be reliably detected by an overlay as it requires predicting the actions a user will take.

b)     While the WCAG is referenced by Section 508, it is not codified by law. Legal requirements in Section 508 and EAA/EN 301 549 contain additional items called "Functional Performance Criteria" that are often subjective, context dependent, and not amenable to machine testing.

c)     The range of potential disabilities is vast. Some accessibility changes tend to benefit

---

[9] Overlay Fact Sheet available at https://overlayfactsheet.com/en/ (accessed June 3, 2024).

[10] See, David Gibson, *Why Website Accessibility Overlay Widgets & Plugins Fail Compliance* available at https://www.accessibility.works/blog/avoid-accessibility-overlay-tools-toolbar-plugins/#:~:text=A%20key%20claim%20is%20that,overlay%20widgets,%20toolbars%20or%20code. Accessed June 4, 2024.

one population while decreasing usability for others. Thus, the more effective usability tools are customized to the user, not to the website.

**Accessibe falsely claims to avoid website accessibility lawsuits for its customers**

35.     Accessibe actively leverages the rise in lawsuits to market its automated widget by claiming its widget will prevent and/or defeat lawsuits alleging ADA violations when the opposite is true. In a tab entitled "Does access Widget mitigates [sic] legal risk?" Accessibe's website claims that by installing its product,

> your website is indeed accessible and compliant and in the rare case of such a claim [alleging lack of ADA compliance], we will provide you with everything you need to prove compliance. … At this point, you should have enough to stop any lawsuit in its tracks. However, if the case still hasn't been dropped then accessiBe offers a Litigation Support Package which includes documentation and testing from our R&D team, suggested responses, and our ongoing support.[11]

36.     Under its Frequently Asked Questions Accessibe's website has also stated:

**Does accessiBe protect me from lawsuits?**

Absolutely! accessiBe turns inaccessible websites into WCAG and ADA compliant websites. But not only that, accessiBe provides you with a Litigation Support Package, in case you need to prove your ADA website compliance, and guides you through the process.

**How is accessiBe different from accessibility plugins?**

accessiBe is the only AI-powered, automatic solution in the industry today that is proven to make websites fully WCAG and ADA compliant and beat legal cases. accessiBe fully certify and protects your business from litigation around the clock.[12]

---

[11]     https://AccessibeAccessibe.com/support/legal/does-AccessibeAccessibe-mitigates-legal-risk accessed June 2, 2024.

[12] AccessibeAccessibe website as of February 6, 2021, viewable through the "Wayback Machine" at https://web.archive.org/web/20210206173525/https://AccessibeAccessibe.com/#:~:text=Does%20 0AccessibeAccessibe%20protect%20me%20from%20lawsuits%3F

37.	Accessibe has run advertisements stoking and capitalizing on the fear of litigation such as the following Facebook ad it posted in May 2021, which is still publicly available, claiming itself as a "solution" to the prospect of litigation:[13]



38.	In 2021, the Accessibe's CEO publicly responded to a comment on LinkedIn

---

[13]	https://www.facebook.com/AccessibeAccessibe/posts/1948500805336885 accessed June 4, 2024.

implying that using Accessibe's overlay exposed a business to litigation by stating:[14]



39.    Accessibe ran the following Google ad in January 2020 stating "Avoid Lawsuits with Accessibe"[15]



40.    Upon a customer's initial subscription, Accessibe sends a standard email to the subscriber that states "[w]ith Accessibe, you can rest assured that your website is accessible to all people, and of course, compliant with worldwide accessibility legislation." The email further states that being an Accessibe customer means "Automatic, 24/7 accessibility compliance."

41.    Accessibe's claims that its products prevent lawsuits are false. A survey of cases filed in 2021 in ten federal districts shows at least 91 lawsuits were filed in those District Courts alleging that a defendant's website violated the ADA at a time when the Accessibe product was

---

[14] Screenshot of comment on LinkedIn taken October 7, 2021.

[15] Google Ad captured January 1, 2020.

present on the defendant's website on the day the lawsuit was filed. A list of such cases is attached as Appendix A.[16]

42.    The number of lawsuits alleging ADA violations by defendants' websites have risen dramatically since 2021.  Between June 1, 2023 and June 1, 2024 1,041 such cases were filed in this district alone. A disproportionate number of those cases were filed against businesses which had Accessibe's product installed on their websites.

43.    Accessibility industry watchdog UsableNet publishes biannual reports tracking accessibility related lawsuits. Among other things, its reports quantify the number of lawsuits filed against defendants who already had accessibility overlay widgets already installed on their websites. According to the 2023 UsableNet year-end report, "over 900 businesses with an accessibility widget or overlay on their website received a lawsuit in 2023." The 2021 year-end report explicitly concluded that "the promise to prevent ADA lawsuits by using an accessibility widget or overlay isn't real."[17]

44.    A defendant showing that it had the Accessibe widget installed at the time the alleged violation occurred does not stop litigation "in its tracks" as Accessibe claims it will. Indeed, many courts have denied motions to dismiss that claim mootness based on having Accessibe's widget already installed, submitting Accessibe's "certificate of compliance," and using Accessibe's "Litigation Package."[18]

45.    Accessibe's promise of legal support is also misleading. Rather than defending the

---

[16] District courts surveyed were: Southern, Eastern, Central and Northern Districts of California, Eastern, Southern, and Western Districts of New York, Western District of Pennsylvania, Southern District of Florida, and District of Massachusetts.

[17]    Copies    of    UsableNet    reports    available,    with    registration,    at https://usablenet.com/resources?contentType=Reports

[18] See, e.g., *Angeles v. Grace Prod., Inc.*, No. 20-CV-10167 (AJN), 2021 WL 4340427, at *3 (S.D.N.Y. Sept. 23, 2021).

claim, providing actual legal advice, or providing material support, Accessibe's "Legal Support Package" consists only of naked claims that Accessibe products cause all websites to meet WCAG requirements and thus ensure ADA compliance and a copy of Accessibe's automated website audit report. To add insult to injury, instead of providing the "legal support" that Accessibe promises in the event that a customer is sued, Accessibe instead seeks to upsell customers with expensive remediation services. These self-serving materials are essentially useless and are easily rebutted with a declaration from one of the many purported experts utilized by accessibility plaintiff law firms who detail some of the ways in which a website with an Accessibe product installed remains non-compliant.[19]

**Plaintiff Tribeca Skin Center's experience**

46.     Tribeca Skin Center is a dermatology practice that consists of four doctors and twelve staff and has been in operation since 2001. During most of its existence, Tribeca Skin Center has maintained an internet website at www.tribecaskincenter.com.

47.     In or about 2022, Plaintiff's business manager received an email from a colleague talking about the the rise of lawsuits against small businesses alleging that their websites violated the ADA. The email recommended that businesses remediate their websites to ensure compliance with the ADA and specifically encouraged using Accessibe as a cost effective method to making a website ADA compliant.

48.     Plaintiff's business manager consulted with her outside web developing company as to the time and expense of remediating their website and was told it could be done but would take significant time and would be expensive.

49.     Plaintiff's business manager reviewed Accessibe's website and saw the

---

[19] See *id*.

representations Accessibe made regarding the efficacy of its product in automatically rendering a website ADA compliant and thereby eliminating the risk of lawsuits against Plaintiff. Plaintiff's business manager was attracted by the representations that installation would not be time consuming but would take a matter of minutes and would then run automatically. The manager was further attracted by the promise of legal support, included with the subscription fee, in the purportedly unlikely event that the business faced litigation notwithstanding its use of the Accessibe overlay product.

50. Plaintiff, through its business manager and staff, relied on the representations that the accessWidget would effectively bring a website into compliance with all applicable laws and regulations, would thereby protect against the risk of a lawsuit, and that the subscription fee included legal support in the unlikely event of litigation.

51. At the time of the purchase, Accessibe's representations regarding the efficacy of its product was false. At the time of the purchase Accessibe did not inform Plaintiff of the existence of lawsuits against companies that already had the accessWidget installed, nor did it inform Plaintiff of the number of industry insiders who maintain that conforming to WCAG standards cannot be achieved on an automated basis.

52. A member of Plaintiff's staff ran Accessibe's free website "scan." The resulting audit report itemized 33 pages with over a hundred "impacts"—accessibility issues that needed to be remediated. Accessibe's audit report repeatedly cited WCAG 2.0.

53. Plaintiff opened an Accessibe account and received an email stating "Now that you have an account, every website you add is eligible for a 7-day free trial and will become accessible and compliant within 48 hours." Plaintiff signed up for Accessibe's 7-day free trial.

54. Plaintiff was convinced by Accessibe's representations that its accessWidget would

effectively remediate the website accessibility issues such that the website would be rendered ADA compliant and would be continually maintained as such. Plaintiff also believed Accessibe's representations that the product would shield them from the rising wave of ADA lawsuits and that Accessibe would stand behind its product in the form of material legal support. In August 2022, Plaintiff purchased a 1-year subscription to Accessibe's accessWidget at an annual subscription fee of $490. Plaintiff received a key code accompanied by a form welcome email that stated:

> Thank you for becoming a part of the Accessibe mission to make the internet accessible by 2025! With Accessibe, you can rest assured that your website is accessible to all people, and of course, compliant with worldwide accessibility legislation.

> **What does it mean to be an Accessibe customer?**

> - Being a part of making the internet accessible
> - Automatic, 24/7 accessibility compliance
> - Automatic monthly compliance audits
> - Protection from accessibility lawsuits
> - Dedicated support for legal actions

55.     After installing the Accessibe accessWidget on its website, Plaintiff again ran Accessibe's website scan via the Accessibe site, which deemed Plaintiff's website, www.tribecaskincenter.com, "Compliant."

56.     Over the next year, Plaintiff received periodic audit reports from Accessibe stating that its website was fully ADA complaint.

57.     Plaintiff renewed its one-year subscription in August 2023 for another $490.

58.     But for Accessibe's misrepresentations that its product would make Plaintiff's website WCAG compliant, Plaintiff would not have purchased or renewed a subscription.

59.      In January 2024, Plaintiff was served with a summons and complaint of a class action lawsuit alleging that its website did not comply with ADA requirements.

60.     Plaintiff contacted Accessibe within days, provided it with a copy of the complaint,

and asked for the promised legal support. The "support" received consisted of another Accessibe audit report stating that its website conformed to WCAG level AA and was fully ADA compliant and a naked statement that the claims against Plaintiff were invalid. Accessibe then referred Plaintiff to an outside attorney who quoted a cost of over $10,000 to defend against the lawsuit.

61.     Plaintiff retained a different attorney who provided a defense for a fee of $4,000 and ultimately settled the claim with a monetary payment.

62.     Plaintiff retained a legitimate website remediation firm. An audit of Plaintiff's website that Accessibe's automated audit claimed to conform to WCAG Level AA identified dozens of issues of non-conformance. The outside firm manually remediated Plaintiff's website to make it accessible in conformance with the WCAG at a cost of $3,500. This included end-user testing by a legally blind individual.

63.     Had the Accessibe product accomplished what Accessibe represented it would, Plaintiff would have been satisfied with its purchase of a subscription. Plaintiff would not have purchased Accessibe's accessWidget had it known it would not be effective in making its website conform with WCAG standards and comply with the ADA. Nor would Plaintiff have purchased a subscription had Plaintiff known of the frequency of lawsuits against businesses that had installed Accessibe's accessWidget.

64.     Plaintiff has suffered injury and damages as a result of Accessibe's misrepresentations and omissions in amounts that include the price of the subscriptions, the cost of installing the accessWidget, the cost of defending against and resolving the resulting litigation, and the cost of properly remediating the website.

## V. CLASS ALLEGATIONS

65.     Plaintiff brings this action as a class action on its own behalf and on behalf of all other persons or entities similarly situated as members of the proposed Class, under CR 23(a) and (b)3.

66.     The proposed Class is defined as:

> All persons or entities who purchased a subscription to Defendant's "accessWidget" (formerly known as "Accessibe Solution") and/or "accessFlow" during the applicable limitations period.

Plaintiff reserves the right to modify, change, or expand the Class definition, including proposing subclasses, based on discovery and further investigation.

67.     Excluded from the Class are Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendants have a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

68.     Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of its claims on a class-wide basis using the same evidence that would be used to prove those elements in individual actions alleging the same claims.

69.     <u>Numerosity</u>. The members of the Class are so numerous that a joinder of all members would be impracticable. Defendant Accessibe claims to have been installed on over 247,000 websites worldwide. While the exact number of members in the Class is unknown at this time, it is reasonable to assume the Class includes thousands of members. Additionally, it appears

hundreds of putative class members have been sued for ADA violations at a time when the Accessibe product was present on the defendant's website on the day the lawsuit was filed.

70.     Plaintiff reasonably believes the amount in controversy exceeds $5 million.

71.     <u>Commonality and Predominance</u> (CR 23(a)(2) and CR 23(b)(3)). There are numerous questions of law and fact common to Plaintiff and members of the Class. Those common questions of law or fact predominate over questions that may affect only individual Class members. The common issues arising from Accessibe's conduct predominate over any individual issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy. The questions of law and fact common to Plaintiff and members of the Class include, among others, the following:

a.     Whether Accessibe's Terms and Conditions constitute a valid contract;

b.     Whether Accessibe breached the promises in its Terms and Conditions;

c.     Whether Accessibe created and breached implied contracts with Class members;

d.     Whether Accessibe made representations on its website and in advertisements that use of its products would ensure that a website complies with WCAG standards and ensure ADA compliance;

e.     Whether Accessibe's representations regarding compliance with the WCAG and the ADA are false or misleading;

f.     Whether Accessibe's representations that the use of its products will enable a class member to avoid litigation were false or misleading;

g.      Whether Accessibe's statements and representations regarding legal support a Class Member could expect in the event of litigation were false or misleading;

h.      Whether Accessibe concealed and omitted material facts from its advertisements and its disclosures to all Class members regarding its products ability to render websites ADA and WCAG compliant;

i.      Whether Accessibe's misrepresentations or omissions constitute unfair or deceptive practices under New York General Business Law § 349;

j.      Whether the Accessibe's conduct caused Class members to suffer injury/damages; and

j.      The proper measure of damages and the appropriate injunctive relief.

72.     <u>Typicality</u>. Plaintiff's claims are typical of the claims of all Class members because Plaintiff is a class member and was subject to the same standardized contract, same representations, and received the same product as other members of the Class. Plaintiff's interests do not conflict with the interests of any other members of the proposed Class.

73.     <u>Adequacy</u>. Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has retained capable and competent attorneys who have significant experience in complex and class action litigation, including consumer rights litigation. Plaintiff and its counsel are committed to prosecuting this action vigorously on behalf of the Class and have the financial resources to do so. Neither Plaintiff nor its counsel have interests that are contrary to or that conflict with those of the Class.

74.     <u>Superiority</u>. Plaintiff and Class members have suffered and will continue to suffer harm and damages as a result of Defendant's conduct. Absent a class action, most Class members

would likely find the cost of litigating their claims prohibitive. Class treatment is superior to multiple individual suits or piecemeal litigation because it conserves judicial resources, promotes consistency and efficiency of adjudication, provides a forum for small claimants, and deters illegal activities. There will be no significant difficulty in the management of this case as a class action. The members of the Class are readily identifiable from Accessibe's records.

75.     This putative class action meets the requirements of Fed. R. Civ. P. 23(b)(2) and (b)(3).

## VI.     CHOICE OF LAW

76.     Accessibe's Terms of Service provide that if a customer is a resident or is incorporated in the United States or Canada then the agreement between Accessibe and the Customer will be governed by the laws of the State of New York, and any action or proceeding arising from or relating to the Terms of Service may only be brought in the courts located in New York, New York and each party irrevocably submits to such exclusive jurisdiction and venue.

## VII.     CLAIMS

### First Cause of Action

### Breach of Contract and Breach of the Covenant of Good Faith and Fair Dealing

77.     Plaintiff incorporates the above allegations as if fully set forth here.

78.     Plaintiff and each Class member subscribed to Accessibe services which, Accessibe states, are governed by the Terms of Service it drafted as a binding contract.

79.     The stated consideration that Accessibe provides is providing software solutions that will allow each customer to promote the accessibility of websites in accordance with WCAG version 2.1 at the AA level success criteria and with the Americans with Disabilities Act.

80.     Accessibe's Terms and Conditions further state that the installation of its accessWidget enables automatic addressing and resolution of website accessibility issues.

81. Accessibe further promises that it will provide litigation support to customers who face litigation based on allegations that the customer's website does not comply with ADA requirements. Accessibe does not define what it means by litigation support and retains discretion as to what constitutes such support.

82. Under New York law, parties to a contract are required not only to adhere to the express terms of a governing contract, but to also act in good faith when they are vested with discretionary power. Where a party drafts a contract and reserves discretionary power for itself, the party with discretion is required to exercise that power and discretion in good faith. This creates an implied promise to act in accordance with all parties' reasonable expectations.

83. Accessibe's software solutions, including its accessWidget do not address and resolve website accessibility issues in accordance with WCAG at the AA level success criteria and do not result in compliance with the ADA.

84. Accessibe has breached the terms of its contract with each class member by not providing the fundamental service it promised.

85. Accessibe breached its duty of good faith and fair dealing by giving itself discretionary power as to what constitutes litigation support and by not exercising that discretion in good faith and in a manner consistent with its customers' reasonable expectations.

86. As a direct and proximate result of Accessibe's breaches, Plaintiff and the Class have been deprived of money in amounts to be determined at trial and are entitled to recovery of such damages, including prejudgment interest thereon.

87. Class members who have not already been sued for lack of ADA compliance continue to incur ongoing, imminent, and impending threat of litigation by continuing to use Accessibe's service rather than remediating their websites in an effective manner. The Class is

therefore entitled to injunctive relief that will, at a minimum, make them aware that the Accessibe subscription on which they have been relying is ineffective and that will provide effective solutions in a manner to be determined at trial.

## **Second Cause of Action**

### **New York State General Business Law § 349, *et seq.***

88.     Plaintiff incorporates the above allegations as if fully set forth herein.

89.     Plaintiff and Class Members are consumers of Defendant's products and are the end users and intended beneficiaries of said products.

90.     Defendant is engaged in consumer-oriented conduct within the intended ambit of GBL § 349.

91.     Defendant's actions and/or omissions as described herein violated GBL § 349, *et seq.*, which were enacted to protect the consuming public from those who engage in unconscionable, deceptive, or unfair acts or practices in the conduct of any business, trade or commerce.

92.     The ability of Accessibe's products to effectively and automatically adjust underlying code to cause a website to meet WCAG AA level success criteria, to thereby comply with ADA title III, and to effectively safeguard against ADA related litigation were fundamental purposes of Class members' subscription to Accessibe's services.

93.     The likelihood that Defendant's products would not cause a website to meet such WCAG success criteria, would not render a website ADA compliant on an automated basis, and may increase the likelihood of a customer facing ADA related litigation were material facts of which each Class member should have been informed before purchasing subscriptions to Accessibe products.

94.     Defendant failed to inform consumers that its products would not cause websites to

meet WCAG success criteria; and that its product would not render websites ADA compliant. Defendant also failed to inform consumers of the volume of website accessibility lawsuits against Accessibe subscribers. Defendants failure to so inform consumers was and still is likely to deceive reasonable consumers.

95.     Defendant's misleading marketing, advertising, and packaging of its products were likely to deceive reasonable consumers.

96.     Defendant has engaged in unlawful deceptive business acts and practices by omitting disclosure of material information and by providing incorrect information regarding the efficacy of its products on its website, in its promotional materials, and in various internet media.

97.     Defendant continues to engage in unlawful business practices by failing to inform consumers that its products will not yield WCAG success criteria, will not render websites ADA compliant, and will increase, or at least not reduce, the likelihood of a customer facing ADA related litigation.

98.     Defendant continues to engage in unlawful business practices by continuing to misrepresent the efficacy of its products.

99.     As a direct result of Defendant's deceptive business practices, Plaintiff and the Class suffered injury by lost money or property.

100.     Accordingly, Plaintiff seeks on behalf of itself and for all those similarly situated, compensatory and consequential damages, equitable and injunctive relief, punitive damages, costs and reasonable attorneys' fees, and all other relief as appropriate.

### Third Cause of Action
### Breach of Implied Warranty

101.     Plaintiff incorporates the above allegations as if fully set forth herein.

102.     Plaintiff and Class members are "buyers" within the meaning of New York's

implied warranty statute N.Y.U.C.C. LAW § 2-103.

103. Accessibe is a "seller" and its accessWidget and accessFlow products are "consumer goods" within the meaning N.Y.U.C.C. LAW §§ 2-103(1)(d) & 2-105.

104. Accessibe impliedly warranted to Plaintiff and the Class that the products Plaintiff and the Class purchased were "merchantable" within the meaning of N.Y.U.C.C. LAW § 2-314. However, the accessWidget and accessFlow products do not have the quality that a buyer would reasonably expect and were therefore not merchantable.

105. Accessibe's products would not pass without objection in their trade and are not fit for the ordinary purposes for which such goods are sold because they do not accomplish their fundamental purposes.

106. In addition, Accessibe breached its implied warranty of merchantability to Plaintiff and the other Class members because its accessWidget and accessFlow products did not conform to the promises and affirmations of facts set forth on Accessibe's website, in its packaging or marketing, in violation of N.Y.U.C.C. LAW § 2-314(2)(f).

107. Any attempts by Accessibe to disclaim the implied warranty of merchantability is unenforceable, as any such disclaimers were not conspicuous as required by law, and were both procedurally and substantively unconscionable, rendering them unenforceable.

108. As a result, Plaintiff and the Class members were injured through their purchase of non- merchantable products.

109. Under New York's implied warranty statutes, Plaintiff and Class members are entitled to damages and other legal and equitable relief, including, at their election, the purchase price of their subscriptions, or the overpayment of amounts they paid for the products, along with consequential damages, including the cost necessarily incurred to install and then to remove the

Accessibe products.  Plaintiffs and Class members are entitled to costs and attorneys' fees.

## **Fourth Cause of Action**

### **Violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, et seq. ("MMWA")**

110.    Plaintiff incorporates the above allegations as if fully set forth herein.

111.    Accessibe's accessWidget and accessFlow products are consumer products as defined in 15 U.S.C. § 2301(1).

112.    Accessibe is a supplier and a warrantor as defined in 15 U.S.C. § 2301(4) & (5).

113.    The warranty that accompanied the products constitutes a "written warranty" under 15 U.S.C. § 2301(6)(A) and/or (B).

114.    Plaintiff and the other Class members are "consumers" as defined in 15 U.S.C. § 2301(3).  They are consumers because: (a) they are buyers of a consumer product; (b) they are persons entitled under New York law to enforce against the warrantor the obligations of its implied warranty; and (c) they are entitled to enforce a written warranty.

115.    Pursuant to 15 U.S.C. § 2310(e), the Plaintiff and the other Class members are entitled to bring this class action and are not required to give Accessibe notice and opportunity to cure until such time as the Court determines the representative capacity of the Plaintiff pursuant to Rule 23 of the Federal Rules of Civil Procedure.

116.    Accessibe is liable to the Plaintiff and the other Class members pursuant to 15 U.S.C. § 2310(d)(1), because it breached its written warranty.  Specifically, it refused to honor the written warranty by refusing to properly repair or replace the accessWidgets and accessFlow products in a manner that would render them effective for their stated purposes.

117.    In connection with its sales of accessWidget and accessFlow subscriptions, Accessibe gave an implied warranty as defined in 15 U.S.C. § 2301(7); namely, the implied warranty of merchantability. As a part of the implied warranty of merchantability, Accessibe

warranted that its accessibility products were fit for their purpose as effective website remediation tools that would repair websites to make them meet WCAG success criteria and render websites ADA compliant and conformed to the promises and affirmations of fact set forth in its documents that accompanied the start of a customer's subscription, which constitutes packaging and labeling. Accessibe is liable to Plaintiff and the Class pursuant to 15 U.S.C. § 2310(d)(1), because it breached the implied warranty of merchantability, as set forth above.

118.    Pursuant to 15 U.S.C. § 2310(d)(1), Plaintiff and the other Class members are entitled to recover the following damages proximately caused by Accessibe's breaches of its written warranty and the implied warranty of merchantability: (1) direct economic damages at the point of sale in the amount of the difference in value between the value of the products flooring as warranted (the full purchase price) and the value of the products as delivered ($0), and (2) consequential economic damages including without limitation costs incurred in defending and resolving ADA compliance lawsuits and remediating their websites to meet WCAG standards and comply with the ADA.

119.    In addition, pursuant to 15 U.S.C. § 2310(d)(2), Plaintiff and the other Class members are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have been reasonably incurred by Plaintiff and the other Class members in connection with the commencement and prosecution of this action.

### Fifth Cause of Action
### Negligent Misrepresentation

120.    Plaintiff incorporates the above allegations as if fully set forth herein.

121.    Defendant made representations about its accessWidget and accessFlow products that it did not have reasonable grounds to believe were true. These statements include, inter alia,

that their products would cause any website onto which its accessWidget was installed to meet WCAG 2.1 success criteria at the AA level, to render any website ADA compliant, and to decrease the likelihood that a customer would face ADA related litigation once installing Accessibe products.

122. Defendant's statements regarding the efficacy of its products were false.

123. Defendant had control over the efficacy of its products and had a duty to ensure that its products were consistent with the performance that Defendant had represented to its customers.

124. Plaintiff and the Class were induced to purchase subscriptions for Defendant's products as a result of Defendant's negligent misrepresentations, and thereby suffered injury.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for an order:

a.    Certifying this case as a class action, appointing Plaintiff as Class representative, and appointing Plaintiff's counsel to represent the Class;

b.    Entering judgment for Plaintiff and the Class;

c.    Awarding Plaintiff and Class Members monetary relief;

d.    Ordering appropriate injunctive relief;

e.    Awarding pre and post judgment interest as prescribed by law;

f.    Awarding reasonable attorneys' fees and costs as permitted by law; and

g.    Granting such further relief as may be just and proper.


Plaintiff further demands trial by jury.

Dated this 24th day of June, 2024.

URIST LAW OFFICES, PLLC

By: /s/ Joshua Urist
Joshua Urist
Email: jurist@uristlaw.com
1441 Broadway, Suite 6147
New York, New York 10018
Telephone: (347) 827-1529

STEIN & NIEPORENT LLP

By: /s/ David Stein
David Stein
David Nieporent
dstein@steinllp.com
dnieporent@steinllp.com
1441 Broadway, Suite 6090
New York, New York 10018
Telephone: (212) 308-3444

LAW OFFICES OF ARI BROWN, PLLC

By: /s/ Ari Brown
Ari Brown (*Pro Hac Vice* forthcoming)
abrownesq@gmail.com
3909 47th Ave. S
Seattle, WA 98118
Telephone: (206) 412-9320

HEENAN & COOK

By: /s/ John Heenan
John Heenan, (*Pro Hac Vice* forthcoming)
john@lawmontana.com
1631 Zimmerman Trail
Billings, MT 59102
Telephone: (406) 839-9081

*Attorneys for Plaintiff*

**CLASS ACTION COMPLAINT
AND JURY DEMAND**