## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Sherwin K. Parikh MD, P.C. d/b/a Tribeca Skin Center; and Dillon Music, on behalf of themselves and all others similarly situated, | DOCKET NO. 24-cv-4848 |
| Plaintiffs, | **FIRST AMENDED CLASS ACTION COMPLAINT** |
| v. | |
| Accessibe, Inc.; John Does 1-5, | **DEMAND FOR JURY** |
| Defendant | |

Plaintiffs Sherwin K. Parikh MD, P.C., d/b/a Tribeca Skin Center (hereinafter "Tribeca Skin Center") and Dillon Music (collectively "Plaintiffs"), individually and on behalf of all other similarly situated ("Class Members"), bring this Complaint against Defendant Accessibe, Inc.[1] ("Accessibe") and allege the following based on personal knowledge as to their own respective actions, based on their counsel's investigations, and upon information and belief as to all other matters as follows:

### I.     INTRODUCTION

1.     Plaintiffs bring this action for damages caused by Accessibe's misleading and false representations in its advertising, its direct marketing, its standard form correspondences with customers, and in its terms of service regarding its "overlay" products. Accessibe represents that its products will adjust any website's underlying code to ensure that the website meets all legal and regulatory standards needed to comply with Title III of the Americans with Disabilities Act ("ADA") and that it will cause any website to satisfy specific and exacting criteria. Plaintiffs further seek injunctive relief that would require Accessibe to discontinue its deceptive practices.

---

[1] Accessibe operates under the stylized name accessiBe. This action refers to the company by the more common capitalization style and reference to Accessibe should be taken to include accessiBe.

2.      The ADA, codified as 42 U.S.C 12101 *et seq.*, seeks to prevent discrimination based on disability by requiring businesses to make their public accommodations accessible to people with disabilities. In 2010 the Department of Justice asserted that internet websites constitute public accommodations and that ADA requirements to provide access to people with disabilities apply to internet websites.

3.      Neither the ADA nor its accompanying regulations set out specific criteria itemizing what makes an internet website accessible or what accommodations a website must incorporate. The World Wide Web Consortium ("W3C") is an international organization that has published and periodically updated the Web Content Accessibility Guidelines ("WCAG") as guidelines for website designers to improve internet accessibility to people with a range of disabilities.

4.      The ADA does not explicitly incorporate the WCAG. Nevertheless, the WCAG standards and recommendations are commonly viewed as the industry standard for internet website compliance with the ADA. The WCAG is incorporated by reference in Section 508 of the Rehabilitation Act that governs Federal departments and agencies' use of electronic and information technology. The WCAG is used as the technical standard for multiple international accessibility laws, including the European Accessibility Act ("EAA") in a policy document known as EAA / EN 301 549.

5.      Recent years have seen a dramatic increase in lawsuits alleging that a business's website does not comply with ADA Title III. Most of these cases are filed by a small number of law firms that file hundreds of nearly identical boilerplate complaints with nearly identical factual

**CLASS ACTION COMPLAINT
AND JURY DEMAND**

allegations.[2] While such claims are rarely, if ever, tried to verdict, the legal actions are nonetheless disruptive and expensive for the businesses that are sued.

6.      The process of remediating a website to ensure ADA compliance and to meet WCAG success criteria, requires significant time and effort and can cost tens of thousands of dollars. In 2018, Accessibe, began marketing "overlay" products that it claimed obviate the need for the labor-intensive process of manually remediating a website to comply with WCAG standards. Accessibe claims that its product, that it calls a "widget" and markets as an "accessWidget," can be installed in a matter of minutes and then employs artificial intelligence and automation to repair a website's underlying code and to render a website consistent with WCAG standards. Accessibe specifically claims that its widget ensures ADA compliance within 48 hours of being installed. Accessibe further claims that its product, using artificial intelligence, will continue to automatically ensure ADA compliance and will thereby effectively shield a subscriber from lawsuits alleging ADA violations.

7.      Accessibe's claims about the efficacy of its products are overstated and many of its specific representations are materially misleading and false—as is its guarantee that its products will ensure that a website is ADA compliant. Accessibe's fundamental claim is that installing its widget will, without additional manual coding, ensure that a website will meet WCAG recommendations and ADA compliance. This is simply untrue. While its widget adds a line of code to a website and installs certain web accessibility tools, this is a far cry from meeting all or even most WCAG standards. Most accessibility issues remain unaddressed. In many cases,

_____

[2] See, *Martin v. Second Story Promotions, Inc.*, No. 1:22-CV-10438 (MKV), 2024 WL 775140, at *3 (S.D.N.Y. Feb. 26, 2024) (noting that the same plaintiff represented by the same counsel, initiated ten separate ADA website actions with "carbon-copy complaints" in the Southern District of New York on the same day using largely "identical language to state the same conclusory allegations.")

**CLASS ACTION COMPLAINT**
**AND JURY DEMAND**

installing Accessibe's widget actually hinders accessibility, in that Accessibe's widget interferes with necessary accessibility technology tools widely used by users with disabilities who require such accessibility tools to browse the Internet.[3]

8.      Accessibe advertises that its products will lower the likelihood that customers will be sued for violations of the ADA. Accessibe's claims in this regard are false. In fact, businesses that use Accessibe's products are more likely to be the targets of lawsuits. Use of Accessibe's widget serves as a signal that a business has used a flawed shortcut to make its website accessible to people with disabilities—one that actually impedes visually impaired people from using the website.

9.      As more fully described below, Accessibe makes specific and material claims to induce businesses to purchase its widget as an effective alternative to the work required to be ADA compliant. Among these inducements is the promise to provide legal support if the business ever faces legal claims that its website does not comply with the ADA. In truth, Accessibe provides no substantive legal support. A business that faces a lawsuit must then spend thousands of dollars on legal fees to defend against the very lawsuit from which Accessibe promised to shield it.

10.      Plaintiffs and each of the members of the proposed Class purchased subscriptions to Accessibe's products and/or installed its overlay widget on one or more of their websites. Plaintiffs and the proposed Class members did not get the product or service Accessibe claimed to provide and were left exposed to legal claims that, in the case of Plaintiffs and at least hundreds of others, cost them thousands of dollars. Plaintiffs seeks to represent themselves and similarly situated individuals and entities throughout the United States who purchased subscriptions for

---

[3] See, e.g. Overlay Fact Sheet, described infra ¶32, section describing responses by users with disabilities to using overlay products including Accessibe products. Available at https://overlayfactsheet.com/en/#in-their-own-words accessed June 18, 2024.

Accessibe's acccessWidget and/or its "accessFlow" platform for testing, monitoring, and remediating websites. Plaintiffs seek restitution of the monies they and the putative Class spent on Defendant's service, consequential damages, injunctive relief enjoining Defendant's ongoing unlawful, unfair, and deceptive business practices, and other damages on behalf of themselves and the putative Class.

## II.    PARTIES

11.    Plaintiff Sherwin K. Parikh, M.D., P.C., is a professional corporation that operates a dermatology clinic under the name Tribeca Skin Center. Plaintiff Parikh is located in Manhattan and has, at all relevant times, resided in New York County which is located in the Southern District of New York.

12.    Plaintiff Dillon Music is an S. Corporation and a family owned business that is based in Woodbridge New Jersey.

13.    Defendant Accessibe is a company registered in Delaware. Accessibe conducts business in this judicial district and sells its products and subscription services throughout the United States. On information and belief, Accessibe maintains computer servers located in the State of New York, leases office space in New York, and has designated courts located in the city of New York as the exclusive forum for litigating any disputes regarding its products or services.

14.    Defendants John Does 1-5 refer to parents, subsidiaries, and affiliated persons or entities of Accessibe, Inc.

## III.    JURISDICTION AND VENUE

15.    This Court has subject matter jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1332(d)(2), because (a) there are 100 or more Class members, (b) at least one Class member is a citizen of a state that is diverse from Defendant's citizenship, and (c) the matter in controversy

exceeds $5,000,000, exclusive of interest and costs.

16.     This Court has personal jurisdiction over Defendant Accessibe because it maintains office space in this District and regularly transacts business in this district.

17.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a named Plaintiff is located in this District and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District. Venue is also proper in this District as Defendant's standard form terms of service, which it terms a contract with each of its subscribers provides that any legal proceeding be brought in the courts located in New York, New York and governed by the laws of the State of New York.

## IV.     FACTUAL ALLEGATIONS

### Background

18.     Millions of Americans live with disabilities, such as vision, motor, cognitive, or hearing impairments, that affect their ability to access information and content through the internet. Many, if not most websites are not fully accessible to individuals with disabilities.

19.     For example, many visually impaired people cannot view the text and images on a webpage but still want and need to use the Internet. To browse the Internet, these users rely on screen reader technology that presents an audible description of the text and images and enables the user to navigate through the website. Screen readers function by examining the code the computer browser uses to render text and images on a webpage. The screen reader often interprets the document object model (DOM) or the hypertext markup language (HTML). The screen reader reads the code and interprets it. This includes reading and announcing a description of the images that appear on a webpage.

20.     Several website shortcomings and issues can render a webpage less accessible to individuals with disabilities. To address these issues, domestic and international organizations

have promulgated rules and guidelines for website designers to implement to improve accessibility. Chief among these is the WCAG, that sets out specific guidelines to make websites accessible to people with various disabilities including blindness and low vision, deafness and hearing loss, limited movement, speech disabilities, photosensitivity, and learning disabilities. W3C published the most recent version, WCAG 2.2 in October 2023.[4] The previous version, WCAG 2.1, was issued in 2018.

21.    WCAG 2.1 presents 13 broadly worded guidelines for creating accessible content. Those guidelines are further broken down into 73 "Success Criteria" that are written as testable statements that a particular website may either satisfy or not satisfy. The normative portion of the WCAG standard spans 105 pages, when printed.

22.    Conformance with the WCAG is broken into three levels: level A, level AA, and level AAA. A website's "conformance" to a standard is defined as an entire website satisfying the itemized Success Criteria for each standard. That is, there is no content on any portion of the website that violates any of the Success Criteria. For a website to be considered conforming to WCAG level AA, the website must meet all Level AA Success Criteria on each page of the site.[5]

23.    Experts in the accessibility field recommend first auditing a website for errors both with automated tools and with manual testing, followed by remediating the underlying code. They then recommend additional manual testing that reviews a website's accessibility to people with different kinds of disabilities. A full audit and remediation can take weeks or even several months and the cost is a minimum of several thousand dollars, depending on the number of unique pages on the website.

---

[4] WCAG 2.2 is available at https://www.w3.org/TR/WCAG22/#conformance-to-wcag-2-2

[5] See https://www.w3.org/TR/WCAG21/#conformance

***Accessibe falsely claims to automatically make websites conform to WCAG standards at the AA success level***

24.     In 2018, Accessibe began selling a software product in the United States on a subscription basis. Accessibe currently offers annual subscriptions for $490 for its "Standard" package for websites under 1,000 pages, $1,490 for its "Advanced" package that for websites under 10,000 pages, or for additional add on features, and $3,490 for its "Advanced Plus" package for websites under 100,000 pages, or for an additional set of add on features. Accessibe offers monthly subscriptions where the current monthly rates are $49, $149, and $349 for the respective tier packages.

25.     Accessibe claims its product is an effective, quick, and cost-effective alternative to manually remediating a website to meet WCAG standards and to guarantee full compliance with the ADA. Indeed, Accessibe guarantees that installing its widget on a website will make that site fully ADA compliant within 48 hours.

26.     Accessibe offers potential customers a free "scan" of their websites. This automated scan generates a report that invariably itemizes multiple failures in accessibility and a lack of WCAG compliance.

27.     Accessibe's representations are very specific. It does not simply say its products will increase a website's accessibility or improve a website, but specifically represents that by adding a single line of code to a website, installing its accessWidget will automatically cure all accessibility problems, and that its artificial intelligence will continue to scour the website and repair accessibility issues. Accessibe claims that any website will be fully compliant with the ADA and WCAG 2.1 and will ensure that a website conforms to WCAG 2.1 success criteria at the AA level within 48 hours of installation.

28.     Accessibe claims that, its Terms of Service constitutes a contract with each user.

**CLASS ACTION COMPLAINT
AND JURY DEMAND**

The first numbered paragraph of the Terms of Service describes the "purpose" of the services the customer has purchased as follows:

> The purpose of the Services is to provide you with information and/or software solutions that will assist you in promoting the accessibility of website(s) (a website, or portion thereof, on which accessWidget has been correctly installed or which has been remediated using accessServices, shall be referred to as a "Customer Website(s)" or "Your Website") *in accordance with the Web Content Accessibility Guidelines version 2.1 ("WCAG") at the AA level success criteria* and with the Americans with Disabilities Act ("ADA" and together with the WCAG, "Standard").

The Terms of Service further state that:

> Installation of accessWidget enables *automatic addressing and resolution* of website accessibility issues.

> (emphasis added)

29.    Accessibe's public website has, at various times, included representations claiming that use of its product will render a website fully compliant with WCAG standards within 48 hours following a two-minute installation process for a fraction of the cost of undertaking a manual website remediation. Such representations have included, but are not limited to the following:

a)    "By using AI and automation, we can make thousands of websites accessible in the amount of time it used to make just one - and at a fraction of the cost."[6]

b)    On its homepage as it existed on October 20, 2021, Accessibe held itself out as an "automated web accessibility solution for ADA & WCAG compliance," with "2 minute installation for 24/7 automatic accessibility."

c)    As its website as it existed on October 16, 2022, Accessibe's claimed its product will make any website accessible and compliant with WCAG 2.1, ADA Title III,

---

[6] (https://AccessibeAccessibe.com/company) captured October 21, 2021.

Section 508, and EAA/EN 301549 with a single line of JavaScript code "in up to 48 hours" in the following graphic:



d) In a video entitled WCAG 2.1 Compliance Overview Accessibe describes the three levels of WCAG compliance, wherein levels A and AA are required by legislation and states "if you're looking to make your site WCAG compliant, Accessibe is the most affordable and effortless way to achieve that."[7]

e) Nearly every page of Accessibe's website includes a graphic at the bottom of the page with a check mark beside the following text

- WCAG 2.1 COMPLIANCE
- ADA Title III COMPLIANCE
- Section 508 COMPLIANCE
- EAA/EN 301549 COMPLIANCE
- ACA/AODA COMPLIANCE

30.     Accessibe sent direct marketing emails to wide audiences similarly representing that its accessibility interface solves 30% of the ADA and WCAG 2.1 requirements instantly and that the remaining 70% are solved within 48 hours on an automated basis using artificial intelligence.

31.     In a September 19, 2019, Facebook post that remains publicly viewable, Accessibe represented that using its product obviated the need for ***all*** manual remediation work to make a

---

[7]     https://AccessibeAccessibe.com/compliance accessed June 2, 2024.

website compliant, stating: [8]



32.    Upon a customer's initial subscription, Accessibe sends a standard email to the subscriber that states "[w]ith Accessibe, you can rest assured that your website is accessible to all people, and of course, compliant with worldwide accessibility legislation." The email further states that being an Accessibe customer means "Automatic, 24/7 accessibility compliance."

33.    The above claims are false. Experts in the field of internet accessibility overwhelmingly recognize that conforming a website to WCAG standards requires manual remediation and manual testing, which must continue as websites change over time. There are currently no shortcuts that are effective to meet WCAG standards and achieve ADA compliance.

---

[8]    https://www.facebook.com/AccessibeAccessibe/photos/a.1070584513128523/1314238058763166 accessed June 3, 2024.

**CLASS ACTION COMPLAINT
AND JURY DEMAND**

34.    In 2021 a group of professionals in the Internet accessibility community issued an "Overlay Fact Sheet" that evaluated what automated overlays, including Defendant's products, can and cannot do. This document has been endorsed by more than 850 signatories that include accessibility experts, disability rights advocates, editors of the WCAG, and end users with disabilities. Among other things, the fact sheet concludes that no existing overlay product on the market can cause a website to become fully compliant with any existing accessibility standard. Moreover, the Fact Sheet notes that using an automated overlay often runs counter to and interferes with accessibility tools on which people with disabilities commonly rely and has a tendency to hinder many disabled persons' ability to navigate internet websites.[9] The Fact Sheet concludes that overlay products like Accessibe's do not help visually impaired people access the web, but instead actually hinder their access.

35.    Practitioners in the field of website accessibility recognize that even the best automated software can only detect 30% of WCAG guidelines and the remaining 70% cannot be assessed or remediated with artificial intelligence but requires human manual testing.[10]

36.    For the following reasons, among others, Accessibe's product cannot provide full ADA compliance for all users:

a)    Many websites are dynamic and WCAG success criteria relate to things that change on a web page during user-triggered action that cannot be reliably detected by an overlay as it requires predicting the actions a user will take.

b)    While the WCAG is referenced by Section 508, it is not codified by law. Legal

---

[9] Overlay Fact Sheet available at https://overlayfactsheet.com/en/ (accessed June 3, 2024).

[10] See, David Gibson, *Why Website Accessibility Overlay Widgets & Plugins Fail Compliance* available at https://www.accessibility.works/blog/avoid-accessibility-overlay-tools-toolbar-plugins/#:~:text=A%20key%20claim%20is%20that,overlay%20widgets,%20toolbars%20or%20code. Accessed June 4, 2024.

**CLASS ACTION COMPLAINT**
**AND JURY DEMAND**

requirements in Section 508 and EAA/EN 301 549 contain additional items called "Functional Performance Criteria" that are often subjective, context dependent, and not amenable to machine testing.

c) The range of potential disabilities is vast. Some accessibility changes tend to benefit one population while decreasing usability for others. Thus, the more effective usability tools are customized to the user, not to the website.

***Accessibe falsely claims that using its products will shield its customers from accessibility related lawsuits, when the exact opposite is true.***

37. Accessibe actively leverages the rise in lawsuits as a tactic to market its automated widget by claiming its widget will prevent and/or defeat lawsuits alleging ADA violations. In a tab entitled "Does access Widget mitigates [sic] legal risk?" Accessibe's website claims that by installing its product,

> your website is indeed accessible and compliant and in the rare case of such a claim [alleging lack of ADA compliance], we will provide you with ***everything you need*** to prove compliance. … At this point, you should have enough to stop any lawsuit in its tracks. However, if the case still hasn't been dropped then accessiBe offers a Litigation Support Package which includes documentation and testing from our R&D team, suggested responses, and our ongoing support.[11]
> (emphasis added)

38. Under its Frequently Asked Questions Accessibe's website has also stated:

> **Does accessiBe protect me from lawsuits?**
> Absolutely! accessiBe turns inaccessible websites into WCAG and ADA compliant websites. But not only that, accessiBe provides you with a Litigation Support Package, in case you need to prove your ADA website compliance, and guides you through the process.
>
> **How is accessiBe different from accessibility plugins?**
> accessiBe is the only AI-powered, automatic solution in the industry today that is proven to make websites fully WCAG and ADA compliant

---

[11]  https://AccessibeAccessibe.com/support/legal/does-AccessibeAccessibe-mitigates-legal-risk accessed June 2, 2024.

CLASS ACTION COMPLAINT
AND JURY DEMAND

and beat legal cases. accessiBe fully certify and protects your business from litigation around the clock.[12]

39.    Accessibe has run advertisements stoking and capitalizing on the fear of litigation such as the following Facebook ad it posted in May 2021, which is still publicly available, claiming itself as a "solution" to the prospect of litigation:[13]

---

[12] Accessibe website as of February 6, 2021, viewable through the "Wayback Machine" at https://web.archive.org/web/20210206173525/https:/AccessibeAccessibe.com/#:~:text=Does%20Accessi beAccessibe%20protect%20me%20from%20lawsuits%3F

[13] https://www.facebook.com/AccessibeAccessibe/posts/1948500805336885 accessed June 4, 2024.



40.    In 2021, the Accessibe's CEO publicly responded to a comment on LinkedIn implying that using Accessibe's overlay exposed a business to litigation by stating:[14]

---

[14] Screenshot of comment on LinkedIn taken October 7, 2021.



41.     Accessibe ran the following Google ad in January 2020 stating "Avoid Lawsuits with Accessibe"[15]



42.     Accessibe's claims that its products prevent lawsuits are false. A survey of cases filed in 2021 in ten federal districts shows at least 91 lawsuits were filed in those District Courts alleging that a defendant's website violated the ADA at a time when the Accessibe product was present on the defendant's website on the day the lawsuit was filed. A list of such cases is attached as Appendix A.[16]

43.     The number of lawsuits alleging ADA violations by defendants' websites have risen dramatically since 2021.  Between June 1, 2023, and June 1, 2024 at least 1,041 such cases were filed in federal court in this district alone. A disproportionate number of those cases were

---

[15] Google Ad captured January 1, 2020.

[16] District courts surveyed were: Southern, Eastern, Central and Northern Districts of California, Eastern, Southern, and Western Districts of New York, Western District of Pennsylvania, Southern District of Florida, and District of Massachusetts.

filed against businesses which had Accessibe's product installed on their websites.

44.    Accessibility industry watchdog UsableNet publishes biannual reports tracking accessibility related lawsuits. Among other things, its reports quantify the number of lawsuits filed against defendants who already had accessibility overlay widgets already installed on their websites. According to the 2023 UsableNet year-end report, "over 900 businesses with an accessibility widget or overlay on their website received a lawsuit in 2023." The 2021 year-end report explicitly concluded that "the promise to prevent ADA lawsuits by using an accessibility widget or overlay isn't real."[17]

45.    A defendant showing a court that it had the Accessibe widget installed at the time the alleged violation occurred does not stop litigation "in its tracks" as Accessibe claims it will. Indeed, many courts have denied motions to dismiss that claim mootness based on having Accessibe's widget already installed, submitting Accessibe's "certificate of compliance," and using Accessibe's "Litigation Package."[18]

46.    Accessibe's promise of legal support is also misleading. Rather than defending the claim, providing actual legal advice, or providing material support, Accessibe's "Legal Support Package" consists only of naked claims that Accessibe products cause all websites to meet WCAG requirements and thus ensure ADA compliance and a copy of Accessibe's automated website audit report. To add insult to injury, instead of providing the "legal support" that Accessibe promises if a customer is sued, Accessibe instead seeks to upsell customers with expensive remediation services. These self-serving materials are essentially useless and are easily rebutted with a

---

[17]    Copies of UsableNet reports available, with registration, at https://usablenet.com/resources?contentType=Reports

[18]    See, e.g., *Angeles v. Grace Prod., Inc.*, No. 20-CV-10167 (AJN), 2021 WL 4340427, at *3 (S.D.N.Y. Sept. 23, 2021).

**CLASS ACTION COMPLAINT**
**AND JURY DEMAND**

declaration from one of the many experts plaintiff law firms utilize and which who detail some of the ways in which a website with an Accessibe product installed remains non-compliant.[19]

**Plaintiff Tribeca Skin Center's experience**

47.     Tribeca Skin Center is a dermatology practice that consists of four doctors and twelve staff and has been in operation since 2001. During most of its existence, Tribeca Skin Center has maintained an internet website at www.tribecaskincenter.com.

48.     In or about 2022, Tribeca Skin Center's business manager received an email from a colleague talking about the the rise of lawsuits against small businesses alleging that their websites violated the ADA. The email recommended that businesses remediate their websites to ensure compliance with the ADA and specifically encouraged using Accessibe as a cost-effective method to make a website ADA compliant.

49.     Plaintiff's business manager consulted with her outside web developing company as to the time and expense of remediating their website. She was told it could be done but would take significant time and would be expensive.

50.     Plaintiff's business manager reviewed Accessibe's website and saw the representations Accessibe made regarding the efficacy of its product in automatically rendering a website ADA compliant and thereby eliminating the risk of lawsuits alleging that the website was not ADA compliant. Plaintiff's business manager was attracted by the representations that installation would not be time consuming but would take a matter of minutes and would then run automatically. The manager was further attracted by the promise of effective legal support, included with the subscription fee, if the business faced litigation notwithstanding its use of the Accessibe overlay product.

---

[19] See *id*.

**CLASS ACTION COMPLAINT
AND JURY DEMAND**

51.    Tribeca Skin Care, through its business manager and staff, relied on the representations that the accessWidget would effectively bring a website into compliance with all applicable laws and regulations, would thereby protect against the risk of a lawsuit, and that the subscription fee included legal support in the unlikely event of litigation.

52.    At the time of the purchase, Accessibe's representations regarding the efficacy of its product was false. At the time of the purchase Accessibe did not inform Tribeca Skin Care of the existence of any of the hundreds of lawsuits against companies that already had the accessWidget installed, nor did it inform Tribeca Skin Center of the number of industry insiders who maintain that conforming to WCAG standards cannot be achieved on an automated basis.

53.    A member of Tribeca Skin Care's staff ran Accessibe's free website "scan." The resulting audit report itemized 33 pages with over a hundred "impacts"—accessibility issues that needed to be remediated. Accessibe's audit report repeatedly cited WCAG 2.0.

54.    Tribeca Skin Care opened an Accessibe account and received an email stating "Now that you have an account, every website you add is eligible for a 7-day free trial and will become accessible and compliant within 48 hours." Plaintiff signed up for Accessibe's 7-day free trial.

55.    Tribeca Skin Care's business manager was convinced by Accessibe's representations that its accessWidget would effectively remediate the website accessibility issues such that the website would be rendered ADA compliant and would be continually maintained as such. Plaintiff also believed Accessibe's representations that the product would shield them from the rising wave of ADA lawsuits and that Accessibe would stand behind its product in the form of material legal support. In August 2022, Plaintiff purchased a 1-year subscription to Accessibe's accessWidget at an annual subscription fee of $490. Plaintiff received a key code accompanied by

a form welcome email that stated:

> Thank you for becoming a part of the Accessibe mission to make the internet accessible by 2025! With Accessibe, you can rest assured that your website is accessible to all people, and of course, compliant with worldwide accessibility legislation.

> **What does it mean to be an Accessibe customer?**

> - Being a part of making the internet accessible
> - Automatic, 24/7 accessibility compliance
> - Automatic monthly compliance audits
> - Protection from accessibility lawsuits
> - Dedicated support for legal actions

56.     At no time did Tribeca Skin Care's office manager or any staff member who was involved in running a free trial or opening an account notice the small print at the bottom of Accessibe's web page purporting to bind Tribeca Skin Care to Accessibe's Terms of Service simply by proceeding. Tribeca Skin Care was not required to check a box or make any indication that they agreed to Accessibe's Terms of Service at any time in the course of reviewing the product or in subscribing to Accessibe's service. The statement that the Terms of Service would be automatically binding was not conspicuously placed.

57.     After installing the Accessibe accessWidget on its website, a member of Tribeca Skin Care's staff again ran Accessibe's website scan via the Accessibe site, which deemed Plaintiff's website, www.tribecaskincenter.com, "Compliant."

58.     This representation was false and misleading.  Tribeca Skin Care relied on Accessibe's representation that its website was compliant to forego having its website properly remediated.

59.     Over the next year, Tribeca Skin Care received periodic audit reports from Accessibe stating that its website was fully ADA complaint. These representations were similarly

false and misleading and Tribeca Skin Care continued to rely on Accessibe's false representations.

60.    Tribeca Skin Care renewed its one-year subscription in August 2023 and paid Accessibe another $490.

61.    But for Accessibe's misrepresentations that its product would make Tribeca Skin Care's website ADA compliant and that it would satisfy WCAG success criteria, Tribeca Skin Care would not have purchased or renewed a subscription.

62.    In January 2024, Tribeca Skin Care was served with a summons and complaint of a class action lawsuit alleging that its website did not comply with ADA requirements.

63.    Tribeca Skin Care contacted Accessibe within days, provided it with a copy of the complaint, and asked for the promised legal support. The "support" received consisted of another Accessibe audit report stating that its website conformed to WCAG level AA and was fully ADA compliant and a naked statement that the claims against Tribeca Skin Care were invalid. Accessibe then referred Tribeca Skin Care to an outside attorney who quoted a cost of over $10,000 to defend against the lawsuit. Accessibe refused to assist with the cost of defense.

64.    A Tribeca Skin Care staff member ran a free scan of the website using one of Accessibe's competitors. The resulting audit report itemized numerous accessibility issues that needed to be remediated.

65.    Tribeca Skin Care retained a different attorney who provided a defense for a fee of $4,000 and ultimately settled the claim with a monetary payment.

66.    Tribeca Skin Care retained a legitimate website remediation firm. An audit of Tribeca Skin Care's website that Accessibe's automated audit claimed to conform to WCAG Level AA identified dozens of issues of non-conformance. The outside firm manually remediated Tribeca Skin Care's website to make it accessible in conformance with the WCAG at a cost to

Tribeca Skin Care of $3,500. This included end-user testing by a legally blind individual.

67.     Had the Accessibe product accomplished what Accessibe represented it would, Plaintiff would have been satisfied with its purchase of a subscription. Tribeca Skin Care would not have purchased Accessibe's accessWidget had it known it would not be effective in making its website conform with WCAG standards and comply with the ADA. Nor would Tribeca Skin Care have purchased a subscription had it known of the frequency with which lawsuits against businesses that had installed Accessibe's accessWidget had already been filed.

68.     Tribeca Skin Care has suffered injury and damages due to Accessibe's misrepresentations and omissions in amounts that include the price of the subscriptions, the cost of installing the accessWidget, the cost of defending against and resolving the resulting litigation, and the cost of properly remediating the website.

**Plaintiff Dillon Music's experience**

69.     Dillon Music is a family-owned business that sells brass and woodwind instruments and musical accessories. It was incorporated in 1992. Since 1997 Dillon music has maintained an internet website at www.dillonmusic.com.

70.     In December 2021 Dillon Music received a handwritten "demand" from someone claiming to be an attorney. The letter alleged that Dillon Music's website was not accessible to people with disabilities and threatened to file a lawsuit if Dillon Music did not pay a monetary settlement. Dillon Music did not respond to the letter and heard nothing more from the sender.

71.     In the process of looking into the allegations, Dillon Music learned about the rise in lawsuits alleging that small-business websites do not comply with the ADA. It asked one of its agents to look into the best way to make its website ADA compliant so as to avoid such demands and the threat of such lawsuits in the future.

**CLASS ACTION COMPLAINT**
**AND JURY DEMAND**

72.     Dillon Music's agent researched various options and recommended using Accessibe's accessWidget. The agent made this recommendation after viewing Accessibe's website and promotional materials and relied on Accesibe's representations regarding the efficacy of its product in automatically rendering a website ADA compliant and meeting all WCAG success criteria.

73.     Dillon Music's owners followed their agent's recommendation. They were particularly drawn by the offer of effective legal support in the event they faced a lawsuit. In August 2023, Dillon Music purchased Accessibe's service and subscribed to a one-year plan at a cost of $1,490 that Dillon Music paid to Accessibe.

74.     In the course of registering and paying for Accessibe's service, none of Dillon Music's members, nor its agent, noticed a link to Accessibe's Terms and Conditions, read the Terms and Conditions, or agreed to its content. There was no requirement to agree to the Terms and Conditions in order to proceed with purchasing the service.

75.     Dillon Music received an access code accompanied by form welcome materials including language substantively identical to the email quoted in Paragraph 55 above.

76.     Dillon Music expended time and resources to install Accessibe's accessWidget on its website. Once installed, Dillon Music's website publicly displayed an icon showing that it had used Accessibe's product.

77.     Dillon Music later renewed its subscription and paid Accessibe an additional $1,490.

78.     At the time of the purchase, Accessibe's representations regarding the efficacy of its product was false. At the time of the purchase Accessibe did not inform Dillon Music of the existence of lawsuits against companies that already had the accessWidget installed, nor did it

inform Plaintiff of the number of industry insiders who maintain that conforming to WCAG standards cannot be achieved on an automated basis.

79.    After installing the Accessibe accessWidget on its website, Dillon Music received periodic "audit reports" from Accessibe stating that Dillon Music's website, www.dillonmusic.com, was "Compliant." These audit reports were false and misleading. Dillon Music relied on Accessibe's representations that its website was compliant to forego having its website properly remediated to meet WCAG success criteria.

80.    But for Accessibe's misrepresentations that its product would make Dillon Music's website WCAG compliant, Dillon Music would not have purchased or renewed a subscription.

81.    In May 2024, Dillon Music was served with a summons and complaint of a class action lawsuit alleging that its website did not comply with ADA requirements.

82.    Dillon Music promptly contacted Accessibe, provided it with a copy of the complaint, and asked for the promised legal support. Accessibe's representative stated that Accessibe would open a "litigation packet."

83.    Dillon Music's owners contacted Accessibe several more times and did not receive any "support" for months. When the promised support finally arrived, it consisted of a video further touting Accessibe's product and another self-serving audit report that Dillon Music has since learned was false and misleading. The information and materials Accessibe touted as "litigation support" provided no material support that would aid Dillon Music in defending against the lawsuit alleging that its website did not comply with the ADA.

84.    Dillon Music's attorney contacted Accessibe and was told that Dillon Music would not receive any further support and, in fact, that it was incumbent on Dillon Music to defend Accessibe and its product at its own expense.

**CLASS ACTION COMPLAINT
AND JURY DEMAND**

85.    Dillon Music has already incurred several thousand dollars in legal fees as a result of the lawsuit that was brought on by its use of Accessibe's product.

86.    Had the Accessibe product accomplished what Accessibe represented it would, Dillon Music would have been satisfied with its purchase of a subscription. Dillon Music would not have purchased Accessibe's accessWidget had it known it would not be effective in making its website conform with WCAG standards and comply with the ADA. Nor would Dillon Music have purchased a subscription had it known of the frequency of lawsuits against businesses that had installed Accessibe's accessWidget.

87.    Plaintiff, Dillon Music, has suffered injury and damages as a result of Accessibe's misrepresentations and omissions in amounts that include the price of the subscriptions, the time and cost of installing the accessWidget, the time and cost of defending against and resolving the resulting litigation, and the cost of properly remediating its website.

## V.    CLASS ALLEGATIONS

88.    Plaintiffs bring this action as a class action on their own behalf and on behalf of all other persons or entities similarly situated as members of the proposed Class, under CR 23(a) and (b)3.

89.    The proposed Class is defined as:

> All persons or entities who purchased a subscription to Defendant's "accessWidget" (formerly known as "Accessibe Solution") and/or "accessFlow" during the applicable limitations period.

Plaintiffs reserve the right to modify, change, or expand the Class definition, including proposing subclasses, based on discovery and further investigation.

90.    Excluded from the Class are Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant has a controlling interest; all

**CLASS ACTION COMPLAINT**
**AND JURY DEMAND**

individuals who timely elect to be excluded from this proceeding using the correct protocol; any and all federal, state or local governments, including their departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

91.    Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence that would be used to prove those elements in individual actions alleging the same claims.

92.    <u>Numerosity</u>. The members of the Class are so numerous that a joinder of all members would be impracticable. Defendant Accessibe claims to have been installed on over 247,000 websites worldwide. While the exact number of members in the Class is unknown at this time, it is reasonable to assume the Class includes thousands of members. Additionally, it appears hundreds of putative class members have been sued for ADA violations at a time when the Accessibe product was present on the defendant's website on the day the lawsuit was filed.

93.    Plaintiffs reasonably believe the amount in controversy exceeds $5 million.

94.    <u>Commonality and Predominance</u> (CR 23(a)(2) and CR 23(b)(3)). There are numerous questions of law and fact common to Plaintiffs and members of the Class. Those common questions of law and fact predominate over questions that may affect only individual Class members. The common issues arising from Accessibe's conduct predominate over any individual issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy. The questions of law and fact common to Plaintiffs and members of the Class include, among others, the following:

a.    Whether Accessibe's website representations constituted the terms of an express contract with each purchaser and whether Accessibe breached those terms;

b.      Whether Accessibe's Terms and Conditions constitute a valid contract and whether Accessibe breached promises in its Terms and Conditions;

c.      Whether Accessibe created and breached implied contracts with Class members;

d.      Whether Accessibe made representations on its website and in advertisements that use of its products would ensure that a website complies with WCAG standards and ensure ADA compliance;

e.      Whether Accessibe's representations regarding compliance with the WCAG and the ADA are false or misleading;

f.      Whether Accessibe's representations that the use of its products will enable a class member to avoid litigation were false or misleading;

g.      Whether Accessibe's statements and representations regarding legal support a Class Member could expect in the event of litigation were false or misleading;

h.      Whether Accessibe concealed and omitted material facts from its advertisements and its disclosures to all Class members regarding its products ability to render websites ADA and WCAG compliant;

i.      Whether Accessibe's misrepresentations or omissions constitute unfair or deceptive practices under New York General Business Law § 349;

j.      Whether the Accessibe's conduct caused Class members to suffer injury/damages; and

k.      Whether Accessibe's attempts to waive all potential liability is substantively and procedurally unconscionable or otherwise void;

**CLASS ACTION COMPLAINT
AND JURY DEMAND**

l.    The proper measure of damages and the appropriate injunctive relief.

95.    <u>Typicality</u>. Plaintiffs' claims are typical of the claims of all Class members because Plaintiffs are class members and were subject to the same contract, same representations, and received the same product as other members of the Class. Plaintiffs' interests do not conflict with the interests of any other members of the proposed Class.

96.    <u>Adequacy</u>. Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs have retained capable and competent attorneys who have significant experience in complex and class action litigation, including consumer rights litigation. Plaintiffs and their counsel are committed to prosecuting this action vigorously on behalf of the Class and have the financial resources to do so. Neither Plaintiffs nor their counsel have interests that are contrary to or that conflict with those of the Class.

97.    <u>Superiority</u>. Plaintiffs and Class members have suffered and will continue to suffer harm and damages directly resulting from Defendant's conduct. Absent a class action, most Class members would likely find the cost of litigating their claims prohibitive. Class treatment is superior to multiple individual suits or piecemeal litigation because it conserves judicial resources, promotes consistency and efficiency of adjudication, provides a forum for small claimants, and deters illegal activities. There will be no significant difficulty in the management of this case as a class action. The members of the Class are readily identifiable from Accessibe's records.

98.    This putative class action meets the requirements of Fed. R. Civ. P. 23(b)(2) and (b)(3).

## VI.    CHOICE OF LAW

99.    The Terms of Service that Accessibe drafted provide that if a customer is a resident or is incorporated in the United States or Canada then the agreement between Accessibe and the

Customer will be governed by the laws of the State of New York, and any action or proceeding arising from or relating to the Terms of Service may only be brought in the courts located in New York, New York and each party irrevocably submits to such exclusive jurisdiction and venue.

## VII.    CLAIMS

### First Cause of Action

### Breach of Contract and Breach of the Covenant of Good Faith and Fair Dealing

100.    Plaintiffs incorporate the above allegations as if fully set forth here.

101.    Plaintiffs and each Class member subscribed to Accessibe services based on representations on its website and its other materials, including those summarized in paragraphs 24-32 and 37-38 above, that subscribing to its service will cause their websites to meet WCAG success criteria and thereby guarantee full compliance with the ADA, and that its service will effectively insulate companies from litigation alleging violations of the ADA. Accessibe's representations therefore constitute a contract with each of its subscribers.

102.    In addition to its representations elsewhere, Accessibe's Terms of Service, that it drafted, Accessibe states the consideration and fundamental purpose of its contract with its subscribers is to provide software solutions that enable customers "to promote the accessibility of websites in accordance with WCAG version 2.1 at the AA level success criteria and with the Americans with Disabilities Act."

103.    Accessibe's Terms and Conditions similarly state that the installation of its accessWidget enables "automatic addressing and resolution of website accessibility issues."

104.    Accessibe further promises that it will provide litigation support to customers who face litigation based on allegations that the customer's website does not comply with ADA requirements. Accessibe does not define what it means by litigation support and retains discretion as to what constitutes such support.

**CLASS ACTION COMPLAINT**
**AND JURY DEMAND**

105.    Under New York law, parties to a contract are required not only to adhere to the express terms of a governing contract, but to also act in good faith when they are vested with discretionary power. Where a party drafts a contract and reserves discretionary power for itself, the party with discretion is required to exercise that power and discretion in good faith. This creates an implied promise to act in accordance with all parties' reasonable expectations.

106.    Accessibe's software solutions, including its accessWidget do not address and resolve website accessibility issues in accordance with WCAG at the AA level success criteria and do not result in compliance with the ADA.

107.    Accessibe has breached the terms of its contract with each class member by not providing the fundamental service it promised.

108.    Accessibe breached its duty of good faith and fair dealing by giving itself discretionary power as to what constitutes litigation support and by not exercising that discretion in good faith and in a manner consistent with its customers' reasonable expectations.

109.    As a direct and proximate result of Accessibe's breaches, Plaintiffs and the Class members have been deprived of money in amounts to be determined at trial and are entitled to recovery of such damages, including prejudgment interest thereon.

110.    Class members who have not already been sued for lack of ADA compliance continue to incur ongoing, imminent, and impending threat of litigation by continuing to use Accessibe's service rather than remediating their websites in an effective manner. The Class is therefore entitled to injunctive relief that will, at a minimum, make them aware that the Accessibe subscription on which they have been relying is ineffective and that will provide effective solutions in a manner to be determined at trial.

**CLASS ACTION COMPLAINT
AND JURY DEMAND**

**<u>Second Cause of Action</u>**
**Breach of Implied Contract**
**(in the alternative to First Cause of Action)**

111.    Plaintiffs incorporate the above allegations as if fully set forth here.

112.    Accessibe made detailed and specific representations to Plaintiffs and to each Class Member including, but not limited to the representation that its product would not only render any website ADA compliant, but that it would cause any website to meet WCAG 2.1 success criteria at the AA level within 48 hours of installation.

113.    Accessibe's representations were intended to induce Plaintiffs to rely on them and to purchase subscriptions and/or install its products rather than undertake a proper website remediation.

114.    Plaintiffs and all Class Members did indeed rely Accessibe's representations, by installing Accessibe's products.

115.    Given the language of Accessibe's representations, Plaintiffs' reliance was reasonable.

116.    Plaintiffs' reliance was to their detriment. They paid Accessibe money they would not have otherwise paid, they installed a product that proved both ineffective for its stated purpose and harmful to each Plaintiff and Class Member, and they were induced to forego a proper remediation of their respective websites.

**<u>Third Cause of Action</u>**

**New York State General Business Law § 349, *et seq.***

117.    Plaintiffs incorporate the above allegations as if fully set forth herein.

118.    Plaintiffs and Class Members are consumers of Defendant's products and are the end users and intended beneficiaries of said products.

119.    Defendant is engaged in consumer-oriented conduct within the intended ambit of

**CLASS ACTION COMPLAINT**
**AND JURY DEMAND**

GBL § 349.

120.    Defendant's actions and/or omissions as described herein were materially deceptive and violated GBL § 349, *et seq*., which were enacted to protect the consuming public from those who engage in unconscionable, deceptive, or unfair acts or practices in the conduct of any business, trade or commerce.

121.    The ability of Accessibe's products to effectively and automatically adjust underlying code to cause a website to meet WCAG AA level success criteria, to thereby comply with ADA title III, and to effectively safeguard against ADA related litigation were fundamental purposes of Class members' subscription to Accessibe's services.

122.    The likelihood that Defendant's products would not cause a website to meet such WCAG success criteria, would not render a website ADA compliant on an automated basis, and may increase the likelihood of a customer facing ADA related litigation were material facts of which each Class member should have been informed before purchasing subscriptions to Accessibe products.

123.    Defendant failed to inform consumers that its products would not cause websites to meet WCAG success criteria; and that its product would not render websites ADA compliant. Defendant also failed to inform consumers of the volume of website accessibility lawsuits against Accessibe subscribers. Defendant's failure to so inform consumers was and still is likely to deceive reasonable consumers.

124.    Plaintiffs reasonably relied on Accessibe's representations and Accessibe was the sole party with information showing that its representations were incomplete and/or untrue.

125.    Defendant's misleading marketing, advertising, and packaging of its products were likely to deceive reasonable consumers.

**CLASS ACTION COMPLAINT**
**AND JURY DEMAND**

126.    Defendant has engaged in unlawful deceptive business acts and practices by omitting disclosure of material information and by providing incorrect information regarding the efficacy of its products on its website, in its promotional materials, and in various internet media.

127.    Defendant continues to engage in unlawful business practices by failing to inform consumers that its products will not yield WCAG success criteria, will not render websites ADA compliant, and will increase, or at least not reduce, the likelihood of a customer facing ADA related litigation.

128.    Defendant continues to engage in unlawful business practices by continuing to misrepresent the efficacy of its products.

129.    Accessibe's attempts to disclaim liability under New York's General Business Law § 349 are void as against public policy, and are unenforceable. Accessibe's efforts to disclaim all possible liability for its misrepresentations and omissions were not conspicuous as required by law, are inconsistent with Accessibe's representations in its Terms of Service and other materials, and are both procedurally and substantively unconscionable.

130.    As a direct result of Defendant's deceptive business practices, Plaintiffs and the Class suffered injury by lost money or property.

131.    Accordingly, Plaintiffs seeks on behalf of itself and for all those similarly situated, compensatory and consequential damages, equitable and injunctive relief, punitive damages, costs and reasonable attorneys' fees, and all other relief as appropriate.

### Fourth Cause of Action

### Breach of Implied Warranty

132.    Plaintiffs incorporate the above allegations as if fully set forth herein.

133.    Plaintiffs and Class members are "buyers" within the meaning of New York's implied warranty statute N.Y.U.C.C. LAW § 2-103.

**CLASS ACTION COMPLAINT
AND JURY DEMAND**

134.    Accessibe is a "seller" and its accessWidget and accessFlow products are "consumer goods" within the meaning N.Y.U.C.C. LAW §§ 2-103(1)(d) & 2-105.

135.    Accessibe impliedly warranted to Plaintiffs and the Class that the products Plaintiffs and the Class purchased were "merchantable" within the meaning of N.Y.U.C.C. LAW § 2-314.  However, the accessWidget and accessFlow products do not have the quality that a buyer would reasonably expect and were therefore not merchantable.

136.    Accessibe's products would not pass without objection in their trade and are not fit for the ordinary purposes for which such goods are sold because they do not accomplish their fundamental purposes.

137.    Accessibe further represented that the particular purpose for which its product was designed was to enable websites to meet WCAG 2.1 success criteria at the AA level and to render websites fully compliant with the ADA.

138.    At the time of contracting, Accessibe was aware that its representations as to the purpose of its product were false. Accessibe was in the unique position to know of the falsity of its representations and Plaintiffs relied on Accessibe's skill and judgment to furnish a product that was suitable for its stated purpose.

139.    Accessibe therefore breached its warranty that its product was fit for its express and implied particular purpose under N.Y.U.C.C. LAW § 2-313 and § 2-315.

140.    Any attempts by Accessibe to disclaim its express and implied warranties of merchantability and of fitness for their product's particular purpose are unenforceable, as any such disclaimers were not conspicuous as required by law, are inconsistent with Accessibe's representations in its Terms of Service and other materials, and were both procedurally and substantively unconscionable.

**CLASS ACTION COMPLAINT**
**AND JURY DEMAND**

141.    As a result, Plaintiffs and the Class members were injured through their purchase of non- merchantable products.

142.    Under New York's implied warranty statutes, Plaintiffs and Class members are entitled to damages and other legal and equitable relief, including, at their election, the purchase price of their subscriptions, or the overpayment of amounts they paid for the products, along with consequential damages, including the cost necessarily incurred to install and then to remove the Accessibe products.  Plaintiffs and Class members are entitled to costs and attorneys' fees.

**Fifth Cause of Action**

**Violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, et seq. ("MMWA")**

143.    Plaintiffs incorporate the above allegations as if fully set forth herein.

144.    Accessibe's accessWidget and accessFlow products are consumer products as defined in 15 U.S.C. § 2301(1).

145.    Accessibe is a supplier and a warrantor as defined in 15 U.S.C. § 2301(4) & (5).

146.    The warranty that accompanied the products constitutes a "written warranty" under 15 U.S.C. § 2301(6)(A) and/or (B).

147.    Plaintiffs and the other Class members are "consumers" as defined in 15 U.S.C. § 2301(3).  They are consumers because: (a) they are buyers of a consumer product; (b) they are persons entitled under New York law to enforce against the warrantor the obligations of its implied warranty; and (c) they are entitled to enforce a written warranty.

148.    Pursuant to 15 U.S.C. § 2310(e), the Plaintiffs and the other Class members are entitled to bring this class action and are not required to give Accessibe notice and opportunity to cure until such time as the Court determines the representative capacity of the Plaintiffs pursuant to Rule 23 of the Federal Rules of Civil Procedure.

149.    Accessibe is liable to the Plaintiffs and the other Class members pursuant to 15

U.S.C. § 2310(d)(1), because it breached its written warranty.  Specifically, it refused to honor the written warranty by refusing to properly repair or replace the accessWidgets and accessFlow products in a manner that would render them effective for their stated purposes.

150.    In connection with its sales of accessWidget and accessFlow subscriptions, Accessibe gave an implied warranty as defined in 15 U.S.C. § 2301(7); namely, the implied warranty of merchantability. As a part of the implied warranty of merchantability, Accessibe warranted that its accessibility products were fit for their purpose as effective website remediation tools that would repair websites to make them meet WCAG success criteria and render websites ADA compliant and conformed to the promises and affirmations of fact set forth in its documents that accompanied the start of a customer's subscription, which constitutes packaging and labeling. Accessibe is liable to Plaintiffs and the Class pursuant to 15 U.S.C. § 2310(d)(1), because it breached the implied warranty of merchantability, as set forth above.

151.    Pursuant to 15 U.S.C. § 2310(d)(1), Plaintiffs and the other Class members are entitled to recover the following damages proximately caused by Accessibe's breaches of its written warranty and the implied warranty of merchantability: (1) direct economic damages at the point of sale in the amount of the difference in value between the value of the products flooring as warranted (the full purchase price) and the value of the products as delivered ($0), and (2) consequential economic damages including without limitation costs incurred in defending and resolving ADA compliance lawsuits and remediating their websites to meet WCAG standards and comply with the ADA.

152.    In addition, pursuant to 15 U.S.C. § 2310(d)(2), Plaintiffs and the other Class members are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have been

reasonably incurred by Plaintiffs and the other Class members in connection with the commencement and prosecution of this action.

## Sixth Cause of Action

### Negligent Misrepresentation

153.    Plaintiffs incorporate the above allegations as if fully set forth herein.

154.    Defendant made representations about its accessWidget and accessFlow products that it did not have reasonable grounds to believe were true. These statements include, inter alia, that their products would cause any website onto which its accessWidget was installed to meet WCAG 2.1 success criteria at the AA level, to render any website ADA compliant, and to decrease the likelihood that a customer would face ADA related litigation once installing Accessibe products.

155.    Defendant's statements regarding the efficacy of its products were false, and Defendant knew its representations were false and material at the time they were made.

156.    Defendant had control over the efficacy of its products and had a duty to ensure that its products were consistent with the performance that Defendant had represented to its customers.

157.    Defendant possessed unique and specialized expertise regarding its product and its ability to automatically remediate websites by manipulating the underlying computer code. It therefore occupied a position of trust with each of its customers such that each customer was justified in relying on its expertise.

158.    Plaintiffs and the Class were induced to purchase subscriptions for Defendant's products as a result of Defendant's negligent misrepresentations, and thereby suffered injury.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for an order:

**CLASS ACTION COMPLAINT
AND JURY DEMAND**

a.    Certifying this case as a class action, appointing Plaintiffs as Class representatives, and appointing Plaintiffs' counsel to represent the Class;

b.    Entering judgment for Plaintiffs and the Class;

c.    Awarding Plaintiffs and Class Members monetary relief;

d.    Ordering appropriate injunctive relief;

e.    Awarding pre and post judgment interest as prescribed by law;

f.    Awarding reasonable attorneys' fees and costs as permitted by law; and

g.    Granting such further relief as may be just and proper.

Plaintiffs further demand trial by jury.

**CLASS ACTION COMPLAINT**
**AND JURY DEMAND**

Dated this 24th day of June, 2024.

URIST LAW OFFICES, PLLC

By: /s/ Joshua Urist
Joshua Urist
jurist@uristlaw.com
1441 Broadway, Suite 6147
New York, New York 10018
Telephone: (347) 827-1529

STEIN & NIEPORENT LLP

By: /s/ David Stein
David Stein
David Nieporent
dstein@steinllp.com
dnieporent@steinllp.com
1441 Broadway, Suite 6090
New York, New York 10018
Telephone: (212) 308-3444

LAW OFFICES OF ARI BROWN, PLLC

By: /s/ Ari Brown
Ari Brown (*Pro Hac Vice*)
abrownesq@gmail.com
3909 47th Ave. S
Seattle, WA 98118
Telephone: (206) 412-9320

HEENAN & COOK

By: /s/ John Heenan
John Heenan, (*Pro Hac Vice* forthcoming)
john@lawmontana.com
1631 Zimmerman Trail
Billings, MT 59102
Telephone: (406) 839-9081

*Attorneys for Plaintiffs*

**CLASS ACTION COMPLAINT
AND JURY DEMAND**