UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
SHERWIN K. PARIKH MD, P.C. d/b/a
TRIBECA SKIN CENTER, DILLON
MUSIC, and SAFE LIFE DEFENSE, LLC on
behalf of themselves and all others similarly
situated,

                       Plaintiffs,                           24-cv-4848 (PKC)

           -against-                          OPINION AND ORDER

ACCESSIBE, INC. and JOHN DOES 1-5,

                       Defendants.
-------------------------------------------------------------x

CASTEL, Senior District Judge

        Plaintiffs in this putative class actions are three businesses that have deployed a "widget" created by defendant accessiBe, Inc. ("accessiBe") to render their websites ADA-compliant. According to plaintiffs, accessiBe markets the widget on a subscription basis as "an effective, quick, and cost-effective" means of achieving ADA compliance. (Compl't ¶ 26.) Unsatisfied with the performance of the widget relative to accessiBe's representations about its efficacy, plaintiffs now allege various contract and tort claims. For the reasons that follow, accessiBe's motion to dismiss these claims will be granted in part and denied in part.

BACKGROUND

        The following facts are drawn from the Second Amended Complaint (the "Complaint" or "Compl't") and are taken as true for the purpose of resolving the instant motion. See Faber v. Metropolitan Life Insurance Co., 648 F.3d 98, 104 (2d Cir. 2011).

In recent years, many businesses have been sued in federal court under the Americans with Disabilities Act (the "ADA") over the alleged failure of their websites to be accessible to persons with disabilities.  Plaintiffs aver that "[w]hile such claims are rarely, if ever, tried to verdict, the legal actions are nonetheless disruptive and expensive for the businesses that are sued."  (Compl't ¶ 5.)

"Neither the ADA nor its accompanying regulations set out specific criteria itemizing what makes an internet website accessible or what accommodations a website must incorporate."  (Id. ¶ 3.)  The "industry standard" for evaluating website ADA compliance is instead the Web Content Accessibility Guidelines ("WCAG"), which are "published and periodically updated" by the World Wide Web Consortium.  (Id.)  The most recent version of the guidelines is WCAG 2.2, published in October 2023.  (Id. ¶ 21.)  WCAG 2.1, the previous version, was published in 2018.  (Id.)

WCAG 2.1 is comprised of thirteen "broadly worded guidelines for creating accessible content."  (Id. ¶ 22.)  These guidelines are in turn "broken down into 73 'Success Criteria' that are written as testable statements[.]"  (Id.)  "Conformance with the WCAG is broken into three levels: level A, level AA, and level AAA."  (Id. ¶ 23.)  "For a website to be considered conforming to WCAG level AA, the website must meet all Level AA Success Criteria on each page of the site."  (Id.)

Experts recommend that website remediation to achieve ADA and WCAG compliance be done at least partly manually, as "even the best automated software can only detect 30% of WCAG guidelines[.]"  (Id. ¶¶ 24, 36.)  Manual remediation "requires significant time and effort and can cost tens of thousands of dollars."  (Id. ¶ 6.)  In contrast, accessiBe's "accessWidget" (the "Widget") purports to use artificial intelligence to automatically bring a

website into compliance by repairing its underlying code.  (Id.)  Plaintiffs allege accessiBe specifically claims that the Widget will make any website fully conform to WCAG 2.1 Success Criteria at the AA level, and thus comply with the ADA, within 48 hours of installation.  (Id. ¶ 28.)

AccessiBe also allegedly represents that the Widget will prevent ADA lawsuits. (Id. ¶¶ 38–39.)  Plaintiffs contend that instead, using the Widget "serves as a signal that a business has used a flawed shortcut to make its website accessible[,]" thus heightening legal risk. (Id. ¶ 8.)  In a survey of ten federal district courts, "at least 91 lawsuits were filed in those District Courts alleging that a defendant's website violated the ADA at a time when the Accessibe product was present on the defendant's website on the day the lawsuit was filed."  (Id. ¶ 43.)

Further, "[r]ather than defending the claim [against a user], providing actual legal advice, or providing material support, Accessibe's 'Legal Support Package' consists only of naked claims that Accessibe products cause all websites to meet WCAG requirements and thus ensure ADA compliance and a copy of Accessibe's automated website audit report."  (Id. ¶ 47.)

Plaintiffs Sherwin K. Parikh MD, P.C. d/b/a Tribeca Skin Center ("Tribeca Skin Center"), Dillon Music, and Safe Life Defense, LLC ("Safe Life") installed the Widget after viewing accessiBe's representations about its efficacy and the availability of legal support through accessiBe should a lawsuit arise.[1]  Each plaintiff is alleged to have signed up with accessiBe without checking a box or otherwise agreeing to accessiBe's terms of service.  (Id. ¶¶ 70, 94, 117.)

---

[1] The Complaint occasionally references another accessiBe product called accessFlow.  The Court notes that plaintiffs never allege that they used AccessFlow.

Each plaintiff was sued under the ADA after installing the Widget.  Tribeca Skin Center was sued over its website in January 2024.  (Id. ¶ 76.)  When it requested legal support from accessiBe, it received an accessiBe "audit report stating that its website conformed to WCAG level AA and was fully ADA compliant and a naked statement that the claims against Tribeca Skin C[enter] were invalid."  (Id. ¶ 77.)  Tribeca Skin Center retained an attorney on its own and settled the claim.  (Id. ¶ 80.)  It also "retained a legitimate website remediation firm" that "identified dozens of issues of non-conformance" with WCAG.  (Id. ¶ 81.)

Dillon Music was sued over its website's noncompliance in May 2024.  (Id. ¶ 101.)  It "promptly contacted" accessiBe for legal support but did not receive anything for several months.  (Id. ¶ 102–03.)  When accessiBe did provide support materials, "it consisted of a video further touting AccessiBe's product and another self-serving audit report that Dillon Music has since learned was false and misleading."  (Id. ¶ 103.)  "Dillon Music has already incurred several thousand dollars in legal fees as a result of the lawsuit that was brought on by its use of Accessibe's product."  (Id. ¶ 108.)

Much the same is true about Safe Life's experience.  Safe Life was sued in or around March 2024 over its website's ADA accessibility after installing the Widget.[2]  (Id. ¶ 123.)  When it contacted accessiBe for legal support, accessiBe "responded by conducting another audit report wrongfully claiming that Safe Life Defense's website conformed to WCAG level AA and was fully ADA compliant" and stating that "the claims being brought against Safe Life Defense were vague, misleading, and inaccurate."  (Id.)  Safe Life received no other support from accessiBe relating to the lawsuit against it.  (Id.)  "As a result, Safe Life Defense has been

_____

[2] In or around 2022, before using the Widget, Safe Life "was sued for not making its website ADA compliant and for not satisfying WCAG criteria."  (Compl't ¶ 113.)

forced to spend several thousands of dollars defending against a lawsuit that was based in part on its use of Accessibe's product."  (Id. ¶ 124.)

"On January 3, 2025, following extensive investigation, the Federal Trade Commission ('FTC') made public a complaint and proposed order requiring Accessibe to cease making deceptive representations that its AccessWidget product will make websites WCAG compliant."  (Id. ¶ 48.)  The FTC alleged, among other things, that accessiBe's "representations that accessWidget's software makes any website WCAG compliant and that accessWidget will continue to ensure compliance with WCAG by automatically remediating any changes are 'false or misleading or were not substantiated at the time the representations were made.'"  (Id. ¶ 51.) The Court takes judicial notice of the fact that the FTC's investigation culminated in a $1 million dollar settlement in which accessiBe admitted no wrongdoing.[3]

LEGAL STANDARDS

I.      Rule 12(b)(6) Standard

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  A court assessing the sufficiency of a complaint must disregard legal labels or conclusions, which are not entitled to the presumption of the truth.  Iqbal, 556 U.S. at 678. Instead, the court must examine only the well-pleaded factual allegations, if any, "and then determine whether they plausibly give rise to an entitlement to relief."  Id. at 679.  "Dismissal

---

[3] The Court accords no weight to the FTC action or the settlement, except to the limited extent that plaintiffs acknowledge that certain allegations made by the FTC informed certain allegations made by plaintiffs in their Complaint.

under Rule 12(b)(6) is therefore appropriate only if 'it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law.'" Michael Grecco Products, Inc. v. RADesign, Inc., 112 F.4th 144, 150 (2d Cir. 2024) (quoting Sewell v. Bernardin, 795 F.3d 337, 339 (2d Cir. 2015)).  In reviewing a Rule 12(b)(6) motion, courts assume all factual allegations in the complaint to be true and draw all reasonable inferences in favor of the non-moving party.  Peretti v. Authentic Brands Group LLC, 33 F.4th 131, 137 (2d Cir. 2022).

When reviewing a motion to dismiss pursuant to Rule 12(b)(6), "the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference."  Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002) (quoting International Audiotext Network, Inc. v. American Telephone and Telegraph Co., 62 F.3d 69, 72 (2d Cir. 1995) (per curiam)).  "Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint."  Id. at 153 (quoting International Audiotext, 62 F.3d at 72).

## II.     Rule 12(b)(1) Standard

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000).  "In resolving a motion to dismiss under Rule 12(b)(1), the district court must take all uncontroverted facts in the complaint . . . as true, and draw all reasonable inferences in favor of the party asserting jurisdiction." Tandon v. Captain's Cove Marina of Bridgeport, Inc., 752 F.3d 239, 243 (2d Cir. 2014).

DISCUSSION

    I.        <u>Plaintiffs Are Bound by AccessiBe's Terms of Service</u>

AccessiBe's motion to dismiss is in large measure premised on its contention that plaintiffs are bound by its terms of service and that these terms foreclose reliance upon representations and otherwise limit accessiBe's liability.

The Court first addresses plaintiffs' contention that they are not bound by accessiBe's terms of service because (1) the terms were not sufficiently conspicuous and plaintiffs therefore lacked inquiry or direct notice, and (2) plaintiffs never manifested assent to the terms. For the following reasons, the Court concludes the terms of service do bind plaintiffs.

AccessiBe presents users or would-be users with its terms of service during the sign-up process.[4] (<u>See</u> Compl't ¶ 70.) The terms of service are hyperlinked just above the "Sign Up" button. The Court has viewed three versions of the sign-up webpage, which reflect how it appeared to visitors at three moments in time between 2022 and 2023. (<u>See</u> ECF 61 at 13 n.4 (containing internet archive links).)

The left side of each version of the webpage contains white boxes where users input basic personal information and set a password. Either to the right of the boxes or below them appears to be empty space where graphics may be included. In one version, a rotating graphic displays customer testimonials. Above the boxes are the accessiBe name and logo in large font, as well as a hyperlink permitting users to log in through an existing account in smaller blue font. Below the boxes is a blue "Sign Up" button with text directly above it stating either

---

[4] The Court's description of how the terms of service were presented on accessiBe's website is based on the Complaint's factual allegations and the internet archive links plaintiffs provide in their response to accessiBe's motion. The Court has reviewed the linked content provided by plaintiffs after concluding the Complaint "relies heavily upon its terms and effect." <u>See</u> <u>Chambers</u>, 282 F.3d at 153.

"By signing up you agree to our terms of service" or "By creating a new account you agree to accessiBe's Terms of Service and Privacy Policy." The phrases "terms of service" and "privacy policy" are in the same shade of blue as the hyperlink offering the option to sign into an existing account. In two of the versions, the background on the left side of the page is light blue. In one version, it is white.[5] All text on the left side of the page is the same size, save for the accessiBe name and, in one version, the hyperlink to log into an existing account.

The parties disagree over the type of web-based contract that is purportedly formed in the sign-up process. Courts have explained the distinctions among "browsewrap," "clickwrap," "scrollwrap," and "sign-in-wrap:"

> *Browsewrap* exists where the online host dictates that assent is given merely by using the site. *Clickwrap* refers to the assent process by which a user must click "I agree," but not necessarily view the contract to which she is assenting. *Scrollwrap* requires users to physically scroll through an internet agreement and click on a separate "I agree" button in order to assent to the terms and conditions of the host website. *Sign-in-wrap* couples assent to the terms of a website with signing up for use of the site's services[.]

Applebaum v. Lyft, Inc., 263 F. Supp. 3d 454, 465 (S.D.N.Y. 2017) (Koeltl, J.) (emphasis in original) (quoting Berkson v. Gogo LLC, 97 F. Supp. 3d 359, 394–95 (E.D.N.Y. 2015)).

Plaintiffs view the terms of service as a "browsewrap" agreement because "[t]he content of the [terms of service] is not displayed and there is no requirement to manifest assent[.]" (ECF 61 at 21.) AccessiBe insists the terms of service are "sign-in-wrap" because users were not required to click a box manifesting assent but were notified of the existence of the terms and that signing up was a manifestation of assent. The Court agrees with accessiBe and concludes the terms of service are "sign-in-wrap," though notes that "[t]he categorization of

---

[5] In one version of the page, there is a check-box next to the phase "By signing up you agree to our terms of service." However, because plaintiffs aver that none of them checked a box during sign-up, the Court's analysis does not address this point.

types of web-based contracts . . . is not dispositive." Feld v. Postmates, Inc., 442 F. Supp. 3d 825, 829 (S.D.N.Y. 2020).

Where, as here, plaintiffs disclaim having actual notice of the contractual terms, they are nonetheless bound if they were on inquiry notice. The Court thus examines whether "(1) a reasonably prudent person would be on *inquiry* notice of the terms and (2) the user unambiguously manifests assent through . . . conduct that a reasonable person would understand to constitute assent[.]" Edmundson v. Klarna, Inc., 85 F.4th 695, 703 (2d Cir. 2023) (citations omitted) (internal quotation marks omitted). Both inquiries are objective and require inspecting the "design and content of the relevant interface[.]" Id. at 704 (quoting Starke v. Square Trade, Inc., 913 F.3d 279, 289 (2d Cir. 2019)). The Second Circuit has further explained that "the touchstone of the analysis is whether reasonable people in the position of the parties would have known about the terms and the conduct that would be required to assent to them." See Garcia v. Nabfly, Inc., 23-cv-1162, 2024 WL 1795395, at *8 (S.D.N.Y. Apr. 24, 2024) (Gardephe, J.) (alterations omitted) (parenthetically quoting Schnabel v. Trilegiant Corp., 697 F.3d 110, 124 (2d Cir. 2012)).

Several considerations favor accessiBe. First, plaintiffs are businesses, which are generally assumed to have greater sophistication than individual consumers in matters of contracting. See Olsen v. Charter Communications, Inc., 18-cv-3388, 2019 WL 3779190, at *6 (S.D.N.Y. Aug. 9, 2019) (Koeltl, J.) ("If anything, business customers are expected to possess greater sophistication in contract negotiation and understanding."). Second, turning to the web interface itself, the sign-up pages observed by the Court are not cluttered. To the extent there are graphics present, they do not overlap spatially with the terms of service hyperlink. Third, the font size of the terms of service hyperlink is no smaller than any of the other text on the sign-up

portion of the page on the left, except for the accessiBe name and logo, and in one version, the log-in hyperlink.  Fourth, the hyperlink to the terms is right above the "Sign Up" button.

The interface is thus like others courts have concluded put users on inquiry notice, as the "terms are linked on an 'uncluttered' interface and temporally and 'spatially coupled with the mechanism for manifesting assent,' and the user does not need to scroll beyond what is immediately visible to find the terms[.]"  Edmundson, 85 F.4th at 704 (quoting Meyer v. Uber Technologies, Inc., 868 F.3d 66, 78 (2d Cir. 2017)).

Plaintiffs complain about the lack of color contrast between the blue terms of service hyperlink and light blue background, as well as the thinness of the hyperlink's font.  But while the blue background creates less contrast than the white background, the difference does not move the needle on the Court's analysis, as the hyperlink remains clearly visible against the blue background.  And it is not the case that all text on the page besides the hyperlink is bold. The only bold text on the left side of the page appears to be the "Sign Up" button and the link to login to a pre-existing account.

Plaintiffs' attempt to distinguish Feld v. Postmates, Inc., 442 F. Supp. 3d 825 (S.D.N.Y. 2020), is unavailing.  That the hyperlink in Feld was presented in a popup box does not help plaintiffs, as the hyperlink here is also isolated to a portion of the page without distracting graphics or images.  See 442 F. Supp. 3d at 831.  Nor is plaintiffs' attempt to analogize to Applebaum v. Lyft, Inc., 263 F. Supp. 3d 454 (S.D.N.Y. 2017), persuasive.  In that case, the phrase "I agree to Lyft's Terms of Service" was "in the smallest font on the screen, dwarfed by the jumbo-sized pink 'Next' bar at the bottom of the screen and the bold header 'Add Phone Number' at the top."  263 F. Supp. 3d at 466 (emphasis omitted).  Here, the terms of service hyperlink is the same size as the vast majority of the other text on the page.  And the

"Sign Up" button is blue, like the hyperlink.  The Court also declines plaintiffs' invitation to follow a California state court in placing the "onus . . . on website owners to put users on notice of the terms to which they wish to bind consumers," Sellers v. JustAnswer LLC, 73 Cal. App. 5th 444, 475–76 (2021) (citations omitted), as it is not the law of this Circuit, as explained above.

Finally, plaintiffs suggest it is problematic that accessiBe "seeks to impose its [terms of service] based on customers proceeding with a free trial."  (ECF 61 at 21.)  Courts have been unmoved by this kind of argument.  See Nicosia v. Amazon.com, Inc., 384 F. Supp. 3d 254, 270 (E.D.N.Y. 2019), aff'd, 815 F. App'x 612 (2d Cir. 2020) ("It is fairly routine for vendors to offer free trials . . . which automatically roll over to paid subscriptions . . . . There can be no doubt that one who agrees to a contract term as part of a free trial remains bound if they automatically convert to a paid subscription."); see also Meyer, 868 F.3d at 80 ("The registration process clearly contemplated some sort of continuing relationship between the putative user and Uber, one that would require some terms and conditions, and the Payment Screen provided clear notice that there were terms that governed that relationship.").  And in any event, the hyperlink to the terms of service and notice that signing up constituted assent was still "conspicuous in light of the whole webpage."  See Nicosia v. Amazon.com, Inc., 834 F.3d 220, 237 (2d Cir. 2016).  The Court thus holds that plaintiffs were on inquiry notice of the terms.

The Court next must ascertain whether plaintiffs' manifestation of assent to the terms of service was sufficient.  The Court concludes that it was sufficient.  AccessiBe's sign-up screen put users on notice that by signing up, they were agreeing to the terms of service.  The "physical proximity of the notice to the ["Sign Up"] button and the placement of the language in the registration flow make clear to the user that the linked terms pertain to the action the user is about to take."  See Meyer, 868 F.3d at 80.  This is true even though plaintiffs allege they did not

click on the hyperlink to read the terms.  Other courts have reached the same conclusion on similar facts.  See, e.g., Edmundson, 85 F.4th at 707 ("Reasonable internet users would understand that selecting 'Confirm and continue' on the Klarna Widget constitutes their confirmation that they 'agree to the payment terms[.]'") (emphasis omitted); Meyer, 868 F.3d at 80 ("The fact that clicking the register button had two functions—creation of a user account and assent to the Terms of Service—does not render Meyer's assent ambiguous.").  Plaintiffs are therefore bound by the accessiBe's terms of service to the extent they are enforceable.

## II.    Breach of Contract and Breach of the Covenant of Good Faith and Fair Dealing

Plaintiffs' first claim is for breach of contract and breach of the implied covenant of good faith and fair dealing (Count 1).

### a.  Breach of Contract

To state a claim for breach of contract under New York law, a "complaint need only allege (1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages."  Eternity Global Master Fund Ltd. v. Morgan Guaranty Trust Co. of New York, 375 F.3d 168, 177 (2d Cir. 2004) (quoting Harsco Corp. v. Segui, 91 F.3d 337, 348 (2d Cir. 1996)).

Plaintiffs assert that the representations accessiBe made about the Widget and the litigation support it offers formed a contract with each of its users, who subscribed to accessiBe based on those representations.  Plaintiffs allege accessiBe breached, first, because the Widget did not cause plaintiffs' websites to achieve the WCAG 2.1 Success Criteria at the AA level, and second, because it did not provide the necessary documentation or support when plaintiffs were sued.

AccessiBe argues there was no breach because the terms of service disclaim all warranties, inform users that accessiBe's products are provided on an "as is" basis, and provide that accessiBe does "not warrant or guarantee that the Services will . . . be immune from unauthorized access or error-free."[6] (See ECF 62 at 9–10, 30.)  The terms of service also provide that "[u]sing accessWidget . . . does not guarantee that you will not receive communications regarding non-compliance of your Customer Website[.]"  (Id. at 9.)  Plaintiffs respond that the terms of service are not a proper basis for dismissal for reasons discussed below.

   i.    Ambiguity

First, plaintiffs contend dismissing the contract claim based on the terms of service would be inappropriate because the terms of service are ambiguous.  This is so, according to plaintiffs, because "there was no box to click" when they signed up for accessiBe, (ECF 61 at 22), yet the terms of service provide:

> By accessing or using a Service, you acknowledge that you have read, understood, and agree to be bound by these Terms. Without derogating from the provisions of the previous sentence, by clicking a box indicating your acceptance of these Terms, you agree that you have read and are bound by these Terms.

(ECF 62 at 3.)

It is true that "a claim predicated on a materially ambiguous contract term is not dismissible on the pleadings."  Eternity Global Master Fund, 375 F.3d at 178 (2d Cir. 2004).  But the Court has explained above that plaintiffs were on inquiry notice of and adequately manifested

---

[6] Plaintiffs provide what they describe as a "true and correct copy" of accessiBe's terms of service dated May 29, 2023.  (ECF 62.)  AccessiBe provides "true and correct" copies of its terms of service from August 2, 2022, August 2, 2023, and May 5, 2022.  Because no party takes issue with any of the versions of the terms of service provided or points to the existence of any changes between the versions that would affect the Court's disposition, the Court will rely on the version provided by plaintiffs.  The Court concludes the copies of the terms of service are integral to the Complaint.  See Chambers, 282 F.3d 147 at 152.

assent to the terms of service, though the mechanism of assent was a "Sign Up" button rather than a checkbox.  The terms of service are therefore not "ambiguous as applied to '[the facts that furnish the basis of the suit][.]'"  See Orlander v. Staples, Inc., 802 F.3d 289, 295 (2d Cir. 2015).

Plaintiffs next argue that interpreting the terms of service as "limiting" accessiBe's promises about its products' purpose would frustrate the purpose of the terms of service.  (ECF 61 at 26.)  The terms of service state that "[t]he purpose of the Services [defined elsewhere as accessiBe's products and services] is to provide you with information and/or software solutions that will assist you in promoting the accessibility of website(s) . . . in accordance with the Web Content Accessibility Guidelines version 2.1 ('WCAG') at the AA level success criteria[.]"  (ECF 62 at 5.)  This passage, however, refers to the purpose of accessiBe's products, not the purpose of the terms of service.  And to the extent plaintiffs are arguing that this passage contradicts the disclaimers in the terms of service and creates an ambiguity, the Court is not persuaded.  The plain meaning of the passage is that the purpose of accessiBe's products is to assist users in achieving better website accessibility.  The "as is" term and the disclaimers of warranties are not contradictory.

### ii.  Liability for Gross Negligence or Willful Misconduct

Plaintiffs maintain that the terms of service are unenforceable insofar as they purport to insulate accessiBe from liability for gross negligence or willful misconduct.  In some circumstances, "New York courts will decline to enforce a contractual limitation or waiver of liability clause when there is willful or grossly negligent or recklessly indifferent conduct."  Baidu, Inc. v. Register.com, Inc., 760 F. Supp. 2d 312, 318 (S.D.N.Y. 2010) (Chin, J.).  Plaintiffs may only overcome "exculpatory clauses or provisions that limit liability to a nominal sum[,]"

not mere "limitations on the remedies available to the non-breaching party," by showing the breaching party was grossly negligent. Serifos Maritime Corp. v. Glencore Singapore Pte Ltd., 24-cv-1303, 2025 WL 1554798, at *2 (2d Cir. June 2, 2025) (summary order) (quoting In re Part 60 Put-Back Litigation, 36 N.Y.3d 342, 349, 353 (2020)).

Conduct is not grossly negligent unless it "smack[s] of intentional wrongdoing" and "evinces a reckless indifference to the rights of others[,]" Abacus Federal Savings Bank v. ADT Security Services, Inc., 18 N.Y.3d 675, 683 (2012) (quoting Sommer v. Federal Signal Corp., 79 N.Y.2d 540, 554 (1992)), or demonstrates "that the defendant failed to 'exercise even slight care, scant care, or slight diligence,'" Baidu, Inc., 760 F. Supp. 2d at 318 (quoting Federal Insurance Co. v. Honeywell, Inc., 641 F. Supp. 1560, 1563 (S.D.N.Y. 1986) (Goettel, J.)). Courts have equated willful misconduct with "intentional" misconduct. See Holmes v. Air Line Pilots Association, International, 745 F. Supp. 2d 176, 200 (E.D.N.Y. 2010) (collecting cases).

As noted, accessiBe's motion relies heavily on the limitation of liability provision in the terms of service, which provides as follows:

> YOU EXPRESSLY UNDERSTAND AND AGREE THAT NO COMPANY PARTIES WILL BE LIABLE TO YOU OR ANY THIRD PARTY FOR ANY INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL, EXEMPLARY DAMAGES, PUNITIVE DAMAGES, OR DAMAGES FOR LOSS OF PROFITS . . . WHETHER BASED ON CONTRACT, TORT, NEGLIGENCE, STRICT LIABILITY, OR OTHERWISE . . . . IN NO EVENT WILL THE COMPANY PARTIES' TOTAL LIABILITY TO YOU FOR ALL DAMAGES, LOSSES, OR CAUSES OF ACTION EXCEED THE AMOUNT YOU HAVE PAID COMPANY DURING THE SIX (6) MONTHS PERIOD PRECEDING THE FIRST EVENT GIVING RISE TO LIABILITY, IF AT ALL, OR, IF GREATER, FIFTY DOLLARS ($50) . . . . IF YOU ARE DISSATISFIED WITH ANY PORTION OF THE SERVICES OR WITH THESE TERMS, YOUR SOLE AND EXCLUSIVE REMEDY IS TO DISCONTINUE USE OF THE SERVICES.

(ECF 62 at 30–31.)  Because the limitation of liability provides that in no event will accessiBe's liability exceed the greater of the amount the user paid to it in the six months before the first event triggering liability or $50, the Court concludes that it effectively restricts damages to a nominal amount.  See IS Chrystie Management LLC v. ADP, LLC, 205 A.D.3d 418, 420 (1st Dep't 2022) (suggesting the gross negligence public policy exception could apply to a limitation of liability permitting a plaintiff to recover three months of fees); cf. Serifos, 2025 WL 1554798, at *2 (construing contractual term providing that defendant "will be responsible ONLY for direct expenses incurred" as providing for more than nominal damages and thus "not subject to the gross negligence public policy rule").  Thus, the terms of service do not foreclose a claim premised upon gross negligence or willful misconduct.

Plaintiffs argue accessiBe's conduct was grossly negligent or willful because accessiBe "knew, or should have known, it could not achieve the promised WCAG compliance on an automated basis."  (ECF 61 at 26.)  Significantly, as alleged in the Complaint, the FTC's investigation of accessiBe discovered that accessiBe's "own testers found WCAG compliance errors on nearly all websites tested."  (Compl't ¶ 53.)  This allegation suggests that accessiBe had some internal awareness that the Widget was not causing full WCAG compliance in users' websites.  Further, in 2021, "a group of professionals in the Internet accessibility community" issued a fact sheet finding that no overlay product existing at the time, such as the Widget, had the ability to bring a website into full compliance with WCAG.  (Id. ¶ 35.)  The fact sheet "has been endorsed by more than 850 signatories that include accessibility experts, disability rights advocates, editors of the WCAG, and end users with disabilities."  (Id.)  Plaintiffs also cite a blog post asserting that "even the best automated software can only detect 30% of WCAG guidelines and the remaining 70% cannot be assessed or remediated with artificial intelligence but requires

human manual testing." (Id. ¶ 36.)  The Court is cognizant that internet chatter may come from biased sources.  Even so, drawing all reasonable inferences in plaintiffs' favor, the allegations concerning accessiBe's promises about WCAG compliance, and the inability of the Widget to achieve that level of compliance, plausibly allege gross negligence or willful misconduct.

Plaintiffs also argue accessiBe was grossly negligent or engaged in willful misconduct because it was aware of "the frequency with which its customers faced ADA litigation" yet "continued to claim" its product would protect against lawsuits.  (ECF 61 at 26; see Compl't ¶¶ 38–42.)  But critically, accessiBe advertises a "Litigation Support Package," which plaintiffs state was attractive to them.  (See Compl't ¶¶ 63, 91, 114.)  If the prospect of a lawsuit was wholly remote, a "Litigation Support Package" would be an unnecessary part of accessiBe's offerings.  Common sense dictates that accessiBe's claim that its product would "stop any lawsuit in its tracks" is puffery.  See International Code Council, Inc. v. UpCodes Inc., 43 F.4th 46, 60 (2d Cir. 2022) (quoting Time Warner Cable, Inc. v. DIRECTV, Inc., 497 F.3d 144, 160 (2d Cir. 2007)) (explaining one "form of puffery involves 'exaggerated, blustering, and boasting statement[s]' that are *objective*—and therefore technically provable—but 'upon which no reasonable buyer would be justified in relying'").  Plaintiffs thus do not plausibly allege gross negligence or willful misconduct as to representations that the Widget would protect against litigation.

In sum, the limitation on liability in the terms of service is unenforceable as applied to plaintiffs' breach of contract claim based on accessiBe's representations that the Widget will achieve full WCAG compliance.  The Court will therefore deny the motion to dismiss the breach of contract claim insofar as it alleges that the representations about WCAG

compliance were a contractual term between the parties that was breached.[7]  The motion to dismiss the claim will otherwise be granted.  The Court will also deny accessiBe's request that the Court strike plaintiffs' request for damages beyond the "amount paid to accessiBe for its services during the six months leading to the alleged breach" as premature.  (ECF 59 at 22–23.)

### b.  Covenant of Good Faith and Fair Dealing

"Under New York law, a covenant of good faith and fair dealing is implicit in all contracts during the course of contract performance."  Tractebel Energy Marketing, Inc. v. AEP Power Marketing, Inc., 487 F.3d 89, 98 (2d Cir. 2007).  "The covenant 'embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'"  Id. (quoting Dalton v. Educational Testing Service, 87 N.Y.2d 384, 389 (1995)).  Further, "[w]here the contract contemplates the exercise of discretion, this pledge includes a promise not to act arbitrarily or irrationally in exercising that discretion[.]"  Dalton, 87 N.Y.2d at 389.

Plaintiffs claim accessiBe breached its duty of good faith and fair dealing by "giving itself discretionary power as to what constitutes litigation support and by not exercising that discretion in good faith and in a manner consistent with its customers' reasonable expectations."  (Compl't ¶ 147.)  The terms of service, however, provide a clear statement of what is encompassed in the Litigation Support Package.  AccessiBe "will provide [users] with relevant documentation and/or materials to demonstrate the accessibility features implemented

---

[7] Plaintiffs have forfeited their unconscionability argument by failing to respond to the arguments in accessiBe's motion on this point.  See, e.g., Maroney v. Woodstream Corp., 695 F. Supp. 3d 448, 468 (S.D.N.Y. 2023) (Karas, J.) (quoting Gordon v. Target Corp., 20-cv-9589, 2022 WL 836773, at *17 (S.D.N.Y. Mar. 18, 2022) (Karas, J.)) ("In the Second Circuit, a plaintiff's failure to respond to contentions raised in a motion to dismiss constitute[s] an abandonment of those claims[.]").

through accessWidget" and users "acknowledge and agree that the provision of the Litigation Support Package is provided as technical assistance only and is not a legal service." (ECF 62 at 9.) Users further "must always consult with [ ] legal advisors, including with respect to use of any outputs of the Litigation Support Package as part of your defense against a third-party claim." (Id.) And accessiBe's "assistance in these cases is limited to [its] Litigation Support Package as described above." (Id.) Plaintiffs were on notice of the limited nature of the Litigation Support Package.

Plaintiffs also allege that accessiBe's "interpretation that its contractual obligation was merely to 'help' or 'improve' website accessibility, rather than achieve WCAG 2.1 AA level compliance is inconsistent with its duty of good faith and fair dealing." (ECF 61 at 20.) That portion of plaintiffs' claim is dismissed as duplicative of the above breach of contract claim. See MDRN Intelligence Living Wolfhome v. Hartford Financial Services Group, Inc., 216 A.D.3d 409, 410 (1st Dep't 2023).

### III.    Breach of Warranty

Plaintiffs assert a claim for breach of express and implied warranties of fitness for a particular purpose under N.Y. U.C.C. §§ 2-313 and 2-315 and breach of implied warranty of merchantability under § 2-314 (Count 4). (Compl't ¶¶ 174–78.)

New York's U.C.C. applies to the sale of goods, which are defined as "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale." N.Y. U.C.C. §§ 2-105, 2-106. Plaintiffs contend the Widget is a "consumer good[]" within the meaning of the New York U.C.C., (Compl't ¶ 173), and accessiBe does not contest this allegation. The Court, however, cannot conclude that the Widget is a "good." See

Genetec, Inc. v. PROS, Inc., 20-cv-07959, 2024 WL 1216472, at *11 (S.D.N.Y. Mar. 21, 2024) (Rochon, J.), amended on other grounds, 2024 WL 3374805 (S.D.N.Y. July 11, 2024) (concluding software-as-a-service product was not a "good" under N.Y. U.C.C.).  Even if the N.Y. U.C.C. did apply, this claim would be duplicative of the breach of contract claim and fail for that independent reason. Plaintiffs therefore fail to state a claim for breach of warranty, and that claim will be dismissed.

IV.    Breach of Implied Contract

Plaintiffs also bring an implied contract claim (Count 2) pled in the alternative to their claim for breach of contract, alleging accessiBe induced them to rely on its representations about its products to their detriment.  (Compl't ¶¶ 151–55.)  Plaintiffs do not make clear whether they are pursuing a theory of contract implied-in-fact or implied-in-law.  "Under New York law, an implied-in-fact contract requires all of the elements required of any valid contract, including consideration, mutual assent, legal capacity, and legal subject matter." Murray v. Northrop Grumman Information Technology, Inc., 444 F.3d 169, 178 (2d Cir. 2006).  An implied-in-law contract, or a quasi-contract, "is not really a contract at all, but rather an equitable obligation imposed in order to prevent a party's unjust enrichment[.]"  UETA Latinamerica, Inc. v. Zafir, 129 A.D.3d 704, 705 (2d Dep't 2015).

Under either theory, plaintiffs fail to state a claim.  Contracts may not be implied in fact or in law when an express contract governs the relevant subject matter.  See Julien J. Studley, Inc. v. New York News, Inc., 70 N.Y.2d 628, 629 (1987) ("A contract cannot be implied in fact where there is an express contract covering the subject matter involved."); Scott v. Fields, 92 A.D.3d 666, 669 (2d Dep't 2012) (citing Clark-Fitzpatrick, Inc. v. Long Island Rail

Road Co., 70 N.Y.2d 382, 388 (1987)) ("A cause of action predicated on a theory of implied contract or quasi-contract is not viable where there is an express agreement that governs the subject matter underlying the action."). The terms of service constitute an express contract governing the parties' agreements for Widget subscriptions. The Court will therefore dismiss the claim.

V.      New York General Business Law Section 349

Plaintiffs' third claim (Count 3) is for deceptive trade practices under New York General Business Law section 349, which prohibits "[u]nfair, deceptive, or abusive acts or practices in the conduct of any business, trade or commerce[.]" N.Y. Gen. Bus. Law § 349. To state a claim under section 349, "a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice." Orlander, 802 F.3d at 300 (quoting Koch v. Acker, Merrall & Condit Co., 18 N.Y.3d 940, 941 (2012)).

And "an act or practice is consumer-oriented when it has 'a broader impact on consumers at large[.]'" Himmelstein, McConnell, Gribben, Donoghue & Joseph, LLP v. Matthew Bender & Co., Inc., 37 N.Y.3d 169, 177 (2021) (quoting Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A., 85 N.Y.2d 20, 26–27 (1995)). Indeed, the substance of section 349 was informed by the legislature's "concern[ ] with the impact of deceptive conduct on consumer purchases." Id. at 176. To be sure, "businesses may sometimes bring § 349 claims[.]" Spirit Locker, Inc. v. EVO Direct, LLC, 696 F. Supp. 2d 296, 304 (E.D.N.Y. 2010). They may only do so, however, "where the defendant's deceptive conduct is, at least to some extent, directed at non-business consumers." Id.

Plaintiffs contend that accessiBe's conduct impacts consumers because the Widget, according to accessiBe, is used on over 247,000 websites and products like accessiBe's can hinder rather than help website accessibility. (Compl't ¶¶ 7, 131.) Accepting the inference that the Widget can hamper website accessibility, the Complaint does not plausibly allege that the Widget is marketed or sold, or intended to be marketed or sold, to consumers, and any impact on consumers is indirect. Plaintiffs urge that each is "a small businesses with no in-house legal counsel and no in-house IT department." (ECF 61 at 14.) But this fact cannot overcome the reality that the Complaint only alleges the deception of business entities, and plaintiffs offer no case law in support of their position.

The New York Court of Appeals has shed light on the types of selling that would qualify as consumer-oriented and both cases are far afield from the allegations in this case. In Himmelstein, McConnell, Gribben, Donoghue & Joseph, LLP v. Matthew Bender & Co., Inc., 37 N.Y.3d 169 (2021), the Court held that the consumer-oriented element of a section 349 claim was met because the defendant sold its "Tanbook," a handbook on New York landlord-tenant law, to both legal professionals and "a robust consumer base[.]" 37 N.Y.3d at 178 (noting that legal professionals are "merely a subclass of consumers"). In Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A., 85 N.Y.2d 20, 26–27 (1995), the consumer-oriented prong was satisfied because the defendant bank's misrepresentation about its savings account interest policies to a pension fund was consumer-oriented in the sense that it may "potentially affect similarly situated consumers" as the bank dealt with the fund's representative "as any customer entering the bank to open a savings account, furnishing the Funds with standard documents presented to customers upon the opening of accounts." Because plaintiffs

have not plausibly alleged that accessiBe's business practices are directed at consumers or otherwise consumer-oriented, the section 349 claim will be dismissed.

VI.     Magnuson-Moss Warranty Act

The Court next addresses plaintiffs' claim under the Magnuson-Moss Warranty Act ("MMWA"), 15 U.S.C. § 2301, et seq. (Count 5).  The MMWA protects consumers who are "damaged by the failure of a supplier, warrantor, or service contractor to comply with . . . a written warranty [or] implied warranty[.]"  Pyskaty v. Wide World of Cars, LLC, 856 F.3d 216, 222 (2d Cir. 2017) (quoting 15 U.S.C. § 2310(d)(1)).  MMWA claims may not be brought in federal court "(A) if the amount in controversy of any individual claim is less than the sum or value of $25; (B) if the amount in controversy is less than the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit; or (C) if the action is brought as a class action, and the number of named plaintiffs is less than one hundred."  See 15 U.S.C. § 2310(d)(3).

AccessiBe argues that plaintiffs' MMWA claim must be dismissed under Rule 12(b)(1) because it does not meet the MMWA's jurisdictional requirements.  Plaintiffs, on the other hand, contend these requirements need not be met here because the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2), provides an alternative basis for jurisdiction over the MMWA claim.

In Lester v. CVS Pharmacy, Inc., 22-cv-7334, 2024 WL 1312935 (S.D.N.Y. Mar. 27, 2024), this Court joined others in holding that failure to meet the "stringent" requirements of section 2310(d)(3) bars a claim under the MMWA notwithstanding federal jurisdiction under CAFA.  See Ghaznavi v. De Longhi America, Inc., 22-cv-1871, 2023 WL 4931610, at *10

- 23 -

(S.D.N.Y. Aug. 2, 2023) (Failla, J.) ("[T]he Court joins the Third and Ninth Circuits in finding that CAFA does not displace the MMWA's stringent federal jurisdictional requirements.").

In Ghaznavi v. De Longhi America, Inc., 22-cv-1871, 2023 WL 4931610, at *8 (S.D.N.Y. Aug. 2, 2023), Judge Failla found persuasive that the plain language of the MMWA provides that "*[n]o claim shall be cognizable* in a suit brought under paragraph (1)(B) of this subsection[,]" i.e., in federal court, unless the jurisdictional requirements are met.  Judge Failla also cited the principle that "'absent a clearly expressed congressional intention to the contrary,' *i.e.*, an explicit amendment or repeal, courts should read statutes in a way that makes each effective."  Id. (quoting Rowland v. Bissell Homecare, Inc., 73 F.4th 177, 183–84 (3d Cir. 2023)).  Courts have found that "the MMWA and CAFA can be reconciled" by reading the latter as "govern[ing] class actions not already provided for by the more specific requirements of the MMWA."  Id.  The Court continues to find this reasoning persuasive and sees no reason to depart from its earlier conclusion in Lester, 2024 WL 1312935.

Turning to the instant action, the Court holds that plaintiffs have not met the MMWA's jurisdictional requirements and may not rely on CAFA to bring their MMWA claim.  While the action is brought as a putative class action, it is indisputable that there are three "named plaintiffs," a number fewer than 100.  See 15 U.S.C. § 2310(d)(3)(C).  The claim also fails for the independent reason that plaintiffs failed to state a breach of warranty claim.  "Because the MMWA provides federal jurisdiction only for underlying state law claims, claims under the [MMWA] stand or fall with the express and implied warranty claims under state law."  Lester, 2024 WL 1312935, at *7 (internal quotation marks omitted) (quoting Valcarcel v. Ahold U.S.A., Inc., 577 F. Supp. 3d 268, 283 (S.D.N.Y. 2021) (Rakoff, J.)).  The claim will therefore be dismissed.

VII.    Negligent Misrepresentation

Finally, plaintiffs bring a claim for negligent misrepresentation (Count 6).  "To state a claim for negligent misrepresentation under New York law, the plaintiff must allege that '(1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment.'"  Anschutz Corp. v. Merrill Lynch & Co., Inc., 690 F.3d 98, 114 (2d Cir. 2012) (quoting Hydro Investors, Inc. v. Trafalgar Power Inc., 227 F.3d 8, 20 (2d Cir. 2000)).

AccessiBe urges the Court to dismiss this claim because, among other reasons, it is duplicative of plaintiffs' breach of contract claim.  The Court agrees.  "Under New York law, 'a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated.'"  MVP Health Plan, Inc. v. OptumInsight, Inc., 765 F. App'x 615, 617 (2d Cir. 2019) (summary order) (quoting Clark-Fitzpatrick, Inc., 70 N.Y.2d at 389).  "This legal duty must spring from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent upon the contract[.]"  Clark-Fitzpatrick, Inc., 70 N.Y.2d at 389.

The Complaint alleges accessiBe "had a duty to ensure that its products were consistent with the performance that [it] had represented to its customers."  (Compl't ¶ 198.)  Plaintiffs fail to explain how this alleged duty is any different than the duty to perform under a contract.  Alleging that there was a "special relationship" between plaintiffs and accessiBe, an

allegation that the Court need not reach, cannot overcome this deficiency.  See LaSalle Bank National Association v. Citicorp Real Estate Inc., 02-cv-7868, 2003 WL 1461483, at *3 (S.D.N.Y. Mar. 21, 2003) (Baer, J.) (finding case law did not support proposition that a special relationship in the context of a negligent misrepresentation claim "creates a duty independent of the contractual duty").  Further, plaintiffs' negligent misrepresentation claim is premised on the same purportedly misleading representations accessiBe is alleged to have made in the breach of contract claim.  Given the foregoing, plaintiffs' negligent misrepresentation claim will be dismissed.

### VIII.   Standing to Pursue Injunctive Relief

The Complaint seeks prospective injunctive relief as to some claims.  AccessiBe argues Tribeca Skin Center and Safe Life lack standing to pursue such relief because they are not current users of accessiBe.  Plaintiffs concede Tribeca Skin Center and Safe Life do not have standing, and accessiBe raises no objection to Dillon Music "remain[ing] as a class representative for claims seeking injunctive relief."  (ECF 63 at 16.)  Accordingly, based on the parties' agreement the Court concludes that Tribeca Skin Center and Safe Life do not have standing to pursue injunctive relief, but Dillon Music does.[8]

### CONCLUSION

AccessiBe's motion to dismiss is GRANTED as to all claims other than the breach of contract claim insofar as it alleges that accessiBe misrepresented its Widget's ability to

---

[8] At the time accessiBe filed its motion to dismiss, Dillon Music remained an active subscriber.  (See ECF 59 at 13–14.)

- 27 -

ensure WCAG and ADA compliance.  In all other respects, the motion is DENIED.  The Clerk is respectfully directed to terminate the motion at ECF 58.

        SO ORDERED.

_____

P. Kevin Castel

United States District Judge

Dated:       New York, New York

            March 31, 2026